**Harold S. KAHM, Appellant,**

v.

**UNITED STATES of America, Appellee.**

No. 18855.

United States Court of Appeals Fifth Circuit.

Feb. 9, 1962.

Certiorari Denied April 23, 1962.

See 82 S.Ct. 949.

James Malcolm Williams, Minneapolis, Minn., for appellant.

John L. Briggs, Asst. U. S. Atty., Jacksonville, Fla., Daniel S. Pearson, Asst. U. S. Atty., Miami, Fla., Edward F. Boardman, U. S. Atty., Southern Dist. of Florida, Miami, Fla., for appellee.

Before TUTTLE, Chief Judge, and POPE * and GEWIN, Circuit Judges.

POPE, Circuit Judge.

Appellant was convicted under an indictment returned in the court below charging him in ten counts with violation of § 1461 of Title 18 U.S.C. Eight of the ten counts charged the knowing use of the mails for the delivery of advertisements giving information as to where, how and from whom obscene, lewd and filthy writings and publications of an indecent character might be obtained. Two counts, (counts 8 and 9), charged him with knowingly causing to be deposited for mailing and delivery in the United States mails certain envelopes containing obscene, lewd and filthy pamphlets, writings and publications of an indecent character.

Appellant pleaded not guilty. Count 1 was dismissed; but after trial by jury, appellant was found guilty on all of the remaining nine counts. He was sentenced to imprisonment for a period of five years on each count, the sentences to run concurrently. The prison sentence was suspended and he was placed on probation.

Upon this appeal the principal contention made is that the evidence was insufficient to sustain the verdict. While appellant's specification lists certain asserted errors in the admission or exclusion of evidence, and in the instructions to the jury, appellant specially emphasizes his position that such listed errors are mentioned only as a basis for his claim that the judgment should be reversed and the cause dismissed;—that he does not seek and does not wish a new trial.[1]

In the course of the Government's case, proof was made of the mailing of the various matters charged in counts 2 to 10 inclusive. In respect to counts 8 and 9, these were the alleged obscene writings; as to the other counts, the proof was of the advertisements which were alleged to have given information as to where, how and from whom the obscene, lewd and filthy pamphlets and publications might be obtained. There is no question as to the fact of mailing nor that the mailing was done by the appellant; and that he knew the contents and character of the transmitted material, for he admitted the mailing and knowledge of its contents. He himself selected it or wrote it and had it printed.

With respect to the advertisements referred to in seven of the nine counts on which appellant was convicted, appellant says that the Government failed to make a case in that it was not proven that the advertisements themselves were obscene; that it was not shown what, if anything, was sent in response to those advertisements, nor that obscene material was so sent.

As will be noted shortly, we find it unnecessary in this case to determine whether the Government's proof with respect to these seven counts was sufficient. If the case of United States v. Hornick, 3 Cir., 229 F.2d 120, was correctly decided, then most of appellant's contentions with respect to the failure to prove what was sent in response to these advertisements would appear to be without validity.[2]

---

* From the Ninth Circuit, sitting by designation.

1. Says the appellant: "NOTE [sic] BENE: The following errors are urged *only* insofar as they bear on a reversal of the judgment herein. They are not intended to bear in any way upon the issue of whether or not a new trial should be granted. This appellant cannot afford, nor does he wish, a new trial. For purposes of the appeal, the sole relief prayed for is a reversal of the judgment and discharge of this defendant from all charges."

2. "We do not think it is necessary that representations made in these advertisements be true. The statute says 'advertisement * * * giving information.'

The record does not sustain appellant's assertion that there was no proof that obscene matters were offered in the advertisements or that such were sent, or intended to be sent, to those who answered.[3]

The evidence offered in support of counts 8 and 9, which we shall describe hereafter, discloses what appellant actually did mail; and it is shown to be the very material described in the portion of the advertisement just quoted.

> The statute does not say that the advertisement must be true or that the information must be accurate. What is forbidden is advertising this kind of stuff by means of the United States mails. We think that the offense of using the mails to give information for obtaining obscene matter is committed even though what is sent in response to the advertisement to the gullible purchasers is as innocent as a Currier and Ives print or a Turner landscape." (p. 122 of 229 F.2d)

3. The advertisements here in question advise that the readers could obtain "a formerly banned course" on "sex for single men" stated to be a course that tells "everything a single man needs to know to enjoy a full and satisfying sex life before marriage." Some of the lessons were listed as follows:

> "Women who crave male love
> "Where to find prostitutes
> "Homosexuality
> "Mutual masturbation
> "How to arouse female passion
> "Positions for intercourse
> "Starting a Sex Club
> "Techniques of seduction
> "Why women 'tease' men
> "How to overcome resistance."

The statement is made that the course had previously been sold for an established price of $29.95 but for a limited time it could be had for $4.95. An order coupon was attached.

Also offered in the advertisement were "Special Publications For Men Only" which contained brief descriptions of some offered articles or documents. These documents are described as follows:

> "*The Art of Seduction.* This is the notorious 'Formula 14' which is the result of years of secret research by a group of college psychologists who were kicked out of the university when the scandalized authorities discovered what they were up to. 'Formula 14' tells exactly what to say to a woman, what to do,

We note, however, that appellant is not in a position to argue the insufficiency of the evidence as to the advertising counts, for, as will presently appear, we hold that the evidence on counts 8 and 9 was sufficient to sustain his conviction on those counts. Since the sentences upon all counts run concurrently with the sentences on counts 8 and 9, it is unnecessary for us to consider the contentions as to the insufficiency of the evidence on the advertising counts. Sinclair v. Unit-

> to arouse her basest passions and to cause her to submit to your manly desires! (10-day money back guarantee! Only $1.
>
> "*Sex Tortures* From ancient times to this very day sex tortures of the most horrible kind have been inflicted upon the helpless, bound naked bodies of male and female victims. All described in picture-clear detail. Don't order this unless you have a strong stomach! (Absolutely not sold to minors! Satisfaction or refund in 10 days. Price $2.00.
>
> "*Stag Limericks* 'There was an old maid from St. Paul
> 'Who went to a birth controlball. * * *'
> And so on. You know the kind we mean? 14 of the best from a famous private collection. You'll agree they're strictly for adults only. Price only $1.
>
> "*Sack's Book Reviews* Censors turn purple and bawl for the police when they discover the sizzling hot pages concealed among the 80,000 words of many seemingly innocent novels. The authors haven't missed a trick: rape, seduction, homo-sexuality, Lesbianism, perversions, gang orgies, wrestling, kicking, biting, whipping, caressing, beating, moaning— all the writhing, bare bedroom facts of life in heartpounding detail are here. Should these books be banned? Judge for yourself! Price only $2.00.
>
> "*Whizbangs* You'll get a terrific bang out of these very naughty, very funny quips, cracks and zippy little tales. Only $1."

The advertisements also offered to furnish any purchaser of these materials a card identifying him as an interviewer for the "Florida National Research Council" referred to as "F.N.R.C." The advertisement stated that the recipient of this card could use it to obtain interviews with women to whom he could represent himself as a researcher seeking information as to the sex life of the interviewee. The advertisement stated that such interviews could lead to an acquaintance resulting in a "sizzling hot friendship".

ed States, 279 U.S. 263 at 299, 49 S.Ct. 268, 73 L.Ed. 692; Hirabayashi v. United States, 320 U.S. 81, 63 S.Ct. 1375, 87 L. Ed. 1774; Lawn v. United States, 355 U.S. 339, 359, 78 S.Ct. 311, 2 L.Ed.2d 321; Pinkerton v. United States, 328 U. S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489; Rogers v. United States, 5 Cir., 128 F.2d 973, 974; Morris v. United States, 5 Cir., 128 F.2d 912, 916.

An examination of the material mailed by appellant under the circumstances charged in counts 8 and 9 discloses that it was of such character as to permit the jury to find that substantially all of the material was plainly obscene within the definition of that term in Roth v. United States, 354 U.S. 476, 487, 77 S.Ct. 1304, 1310, 1 L.Ed.2d 1498. As there stated: "Obscene material is material which deals with sex in a manner appealing to prurient interest." The Court adds in a footnote: "I. e., material having a tendency to excite lustful thoughts. Webster's New International Dictionary (Unabridged, 2d ed., 1949) defines prurient, in pertinent part, as follows: ' * * * Itching; longing, uneasy with desire or longing; of persons, having itching, morbid, or lascivious longings; of desire, curiosity, or propensity, lewd * * *.' Pruriency is defined, in pertinent part, as follows: ' * * * Quality of being prurient; lascivious desire or thought. * * *' "

■ The two batches of material mailed as charged in counts 8 and 9 were identical. Included under the heading of "Sack's Book Reviews" are a number of brief extracts purportedly taken and quoted from books by named authors.

These are not book reviews in the ordinary sense but merely quotations of particularly salacious passages in the books. One is a passage purportedly lifted from the book "Peyton Place" by Grace Metalious. Here are the passages containing a vivid description of the accomplishment of sexual intercourse between a boy and a girl.[4] We take it for granted that a motion picture which portrayed the consummation of a sexual act would be obscene. This mailed portion of an extract from Peyton Place is no less obscene in the sense of the definition of the Roth case.

The manner in which the appellant selected and published the extract just described and the other similar extracts to which we shall shortly allude, makes it plain that the Government here had no difficulty in meeting an additional standard for testing the type of obscenity which Congress may validly exclude from the mails. In Roth the Court rejected the earlier standard under which obscenity could be judged by the effect of an isolated excerpt taken from a book or other writing. The proper standard, the Court said, was used in the instructions given by the trial court in the Roth case. There the jury was told that "the test in each case is the effect of the book, picture or publication considered as a whole * * *." Had the appellant undertaken to send through the mail the book "Peyton Place" a different problem would be presented, for then inquiry would have to be made as to whether notwithstanding the fact that the book contained passages of the kind here referred to, "to the average person, applying contemporary com-

---

4. Both were lying naked on the ground near his automobile. At first she teases him by running away and getting into the automobile, and laughing at him when she turns the car light on him to outline his nakedness. He pulls on his trousers, climbs into the car and starts the car engine when the girl turns off the ignition and immediately changes her mood to one of endearment and seduction, running her hands over his body and seeking his kisses. She then leads him down to the beach where he followed with the car robe on which they fall and embrace. What then happens is described by the author in words of impatient urging of immediate ravishment; —words which vividly portray a breathless, panting, concupiscent, cacoethes for consummation on the part of the girl, and savage eagerness on the part of the boy. Their lustful words, their sensuous body embrace are told with realistic and dramatic vividness to the point of passionate ecstacy that immediately precedes coitus.

munity standards, the dominant theme of the material taken as a whole appeals to prurient interest". No such question is presented to us here for the appellant in merely selecting the most obscene passages from various books has seen to it that his readers are not subjected to any book as a whole.[5]

The appellant cannot assert that such salacious extracts have "the slightest redeeming social importance." He was furnishing his readers only "smut for smut's sake"; and consideration of the other extracts and enclosures but serves to confirm that view and to demonstrate that the mailed material "taken as a whole" served no purpose whatever except to purvey obscenity.[6]

The extract from Peyton Place was accompanied by other so-called "book reviews" which were merely salacious extracts from other named books. One of these salacious extracts was taken from a book entitled "Out For Kicks". Our description of the obscene passages from Peyton Place fits this one precisely, as it does one from a book entitled "The Immortal" and still another from a purported "Nine Days to Mukalla."

Other material enclosed in the envelopes described in counts 8 and 9 may well be classified as hard-core pornography, a term we discuss hereafter. Among the so-called book reviews is a purported extract from a book entitled "The Tribe That Lost Its Head". This is a description of a savage tribal rite which the extract characterizes as loathsome and degraded.[7] Another purported extract is from a book called "Intimacy"; it describes with unblushing detail both homosexual activity and masturbation. From "The Bitter Weed Path" and "Shadows of Shame" are taken descriptions of homosexual embraces. Enclosed in the same parcel of material is a discussion of "Sex Tortures", including, with numerous other descriptions of revolting procedures, an account of "punitive masturbation" and "gang rape". Also in the mailed material is a copy of what was referred to in the advertisement as "Formula 14". This is an extended description of how a man may go about meeting a woman, gradually awakening her interest, and finally seducing her.[8]

We need not speculate on whether since the Court held in Kingsley Intern. Pictures Corp. v. Regents, 360 U.S. 684, 689, 79 S.Ct. 1362, 1365, 3 L. Ed.2d 1512, that the Constitution "protects advocacy of the opinion that adultery may sometimes be proper", it also protects the circulation of detailed instructions on how to accomplish adultery, fornication or seduction. For the mere fact, if it be a fact, that some non-obscene material was included in these packages, would not serve to make the whole mass

---

5. The entire book such as "Peyton Place" might serve a useful purpose and have value in portraying the life of a community whose people have become obsessed with sex; or it might be a useful study in the psychology and mental processes of the author.

6. It is true that the parcels contained some matters that are too trivial, inane, banal and insipid to require serious consideration. These are the matters which were advertised as "stag limericks" and "whiz bangs". (Footnote 3, supra). These are composed of the sort of remarks commonly written on privy walls by mental defectives. When the jury read these they could hardly have credited that part of the appellant's testimony in which he asserted that he had been a serious author or a college professor.

However these portions of the enclosures may be characterized, they certainly added no "redeeming social importance" to the transmitted literature.

7. In this rite a "naked comely girl" continues to "stroke and touch" a male youth who was "lathered with excitement" until the youth, his secret parts all exposed, reached the stage of ejaculation and the emission caught in a bowl.

8. "THE KILL! Soft lights, soft music, plenty of liquor, and, 'Darling, I love you!' Now your hands can do a little very gentle exploring. If as you proceed you get no serious opposition, be sure she's really in the mood before going farther. Take your time! She must be fully aroused! Wait until she is panting for it! And then, very, very slowly, very very gently. * * *"

84

mailable or protect the appellant from prosecution.[9]

Appellant contends that the Government made no case for the jury because no witnesses were called to testify or give their opinions as to whether the mailed material here in question would come within the definition of obscene material stated in Roth. The argument is that merely introducing proof that the material was mailed, proving its contents and that such contents were known to the appellant, was not enough. It seems to be appellant's theory that some qualified witness must be produced to furnish expert testimony was to the effect this material would have upon the average person, applying contemporary community standards, and whether to such a person this material would have an appeal to prurient interest. It is argued that without that proof and proof as to what were the contemporary community standards there was no case for the jury.

We do not suggest that such testimony would not have been appropriate or admissible; or that the appellant, if he chose to do so, could not have offered evidence upon the same subject. In his concurring opinion in Smith v. California, 361 U.S. 147, at pp. 160 and 161, 80 S.Ct. 215, 223, 4 L.Ed.2d 205, Mr. Justice Frankfurter condemned the exclusion of appropriately offered testimony regarding "the prevailing literary standards and the literary and moral criteria by which books relevantly comparable to the book in controversy are deemed not obscene." But such a situation did not arise here. Appellant was permitted to call as his witness a professor of physiology and anthropology

who testified freely and completely. He was also allowed to introduce in evidence the Kinsey report on "Sexual Behavior in the Human Male", and a substantial number of publications and magazines for the purpose of demonstrating that his material was no worse than many other writings available to the public.

It is plain to us that when the jury was instructed by the trial court in language such as that approved by the Supreme Court in the Roth case, it was fully capable of applying those standards and that charge to the materials shown to have been mailed here. Nothing is more common than for a jury in a case involving charges of negligence, as for example negligent homicide, to determine whether the proven conduct measures up to the standards of a reasonably prudent man. We think it may fairly be said that no amount of testimony by anthropologists, sociologists, psychologists or psychiatrists could add much to the ability of the jury to apply those tests of obscenity to the materials here present.[10]

It must be recalled that we are not dealing here with the problem of what happens when a defendant is charged with improper mailing of an entire book in which the literary, artistic or social values of the work must be considered and weighed against certain off-color passages to determine whether the latter are so dominant as to outweigh the other features of the work as a whole. In a case of that kind expert testimony could well be of some value to the jury; but here, where everything mailed is in its entirety lewd and salacious, with no possible redeeming feature about it, the jury was fully qualified to determine

9. Flying Eagle Publications, Inc. v. United States, 1 Cir., 285 F.2d 307, 308: "An obscene picture of a Roman orgy would be no less so because accompanied by an account of a Sunday school picnic which omitted the offensive details."

10. Judge Learned Hand has had occasion to comment on a jury's competence to apply standards of this kind. In United States v. Kennerley, (D.C.S.D.N.Y.) 209 F. 119, 121, he said: "If letters must,

like other kinds of conduct, be subject to the social sense of what is right, it would seem that a jury should in each case establish the standard much as they do in cases of negligence." In United States v. Levine, 2 Cir., 83 F.2d 156, 157, he said: "Thus 'obscenity' is a function of many variables, and the verdict of the jury is not the conclusion of a syllogism of which they are to find only the minor premise, but really a small bit of legislation ad hoc, like the standard of care."

whether the material came within the definitions given to them by the court.

▮ Appellant's expert witness expressed the view that the material here in question was not "hard core pornography", and appellant suggests that hence it is not within the definition of obscenity stated in Roth. If the question of whether this was "hard core pornography" were dispositive of this case, the court and jury were not required to credit or accept the witness' statement. We think he was manifestly wrong as to portions of the material. It is plain that Roth was defining obscene materials in terms which make it manifest that the Court was including material other than "hard core pornography".

The Roth case, while necessarily giving the general definition of "obscenity" previously referred to, did not have occasion to pass upon the obscenity of the material involved in that case and in the case of Alberts v. California which was disposed of in the same opinion. As noted by the Court in its footnote 8, "No issue is presented in either case concerning the obscenity of the material involved".[11]

Since the obscenity of the material involved in the Roth and Alberts cases was not questioned, there was no occasion for the Court to specify, in any all-inclusive manner, what was *not* obscenity. It did define what it considered *was* obscene material, as we have noted.

Although the Court at its next term issued a number of per curiam decisions [12] reversing courts of appeals' decisions holding certain material to be obscene with no more than citation of the Roth or Alberts cases, the definition of obscene material in Roth remains unaltered, and must be our guide. The wording of that definition sufficiently answers

11. What the Roth case decided was: that obscenity is not within the area of constitutionally protected speech or press; that obscene material is defined as stated in the language which we have previously quoted; that in judging as to the existence of obscenity the test to be applied is "whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest." The Court held that the statute here involved is stated in language sufficiently precise so as not to be offensive to the requirements of due process.

12. Times Film Corp. v. City of Chicago, 355 U.S. 35, 78 S.Ct. 115, 2 L.Ed.2d 72, reversing 244 F.2d 432 (7 Cir.); Mounce v. United States, 355 U.S. 180, 78 S.Ct. 267, 2 L.Ed.2d 187, reversing 247 F.2d 148 (9 Cir.); One, Inc. v. Olesen, 355 U.S. 371, 78 S.Ct. 864, 2 L.Ed.2d 352 reversing 241 F.2d 772 (9 Cir.); Sunshine Book Co. v. Summerfield, 355 U.S. 372, 78 S.Ct. 365, 2 L.Ed.2d 352, reversing 101 U.S.App.D.C. 358, 249 F.2d 114, D.C. Cir. In the Mounce case the Government confessed error. Apparently the Court considered that the court below had used the wrong test for it reversed and remanded the case to the district court for consideration of its holding in the light of Roth. In the other cases cited, the Court simply reversed the court of appeals and terminated the litigation. For an attempted explanation of these summary reversals see Collier v. United States, 4 Cir., 283 F.2d 780, 782: "Obviously Roth and Alberts were not overruled in the later decisions, whatever else they decided. Since no opinion was filed in these cases we have no precise guide to the reasons which actuated the Supreme Court other than the reasonable inference that the lower courts had not correctly applied the rule laid down in Roth. Examination of the opinions of the lower courts shows plainly that portions of the materials were obscene in the judgment of intelligent and able men experienced in the finding and appraisal of fact, and the reversal of their conclusions is explicable to us only on the theory that they paid insufficient regard to the rule that in judging accused material attention should be directed not to detached and separate portions but to the whole material in its entire context. The material found by the trial and appellate courts to be obscene in each of these cases was only part of a publication devoted to the promotion of discussion of a particular idea such as the cult of nudism in the Sunshine case, or the subject of homosexuality in One, Inc. v. Olesen; or the material consisted of the adaptation of a book for moving pictures which disclosed illicit sexual relationships incident to the development of the plot, or the illustration of a thesis that the writer desired to expound, as in Times Film Corp. v. City of Chicago, supra."

the suggestion that only "hard core pornography" may be made non-mailable.

If we are to consider appellant's point about obscenity being limited to "hard core pornography" we must understand what is meant by that term. In his separate opinion in Kingsley Pictures Corp. v. Regents, supra, 360 U.S. at pp. 692–693, 79 S.Ct. at page 1362, Mr. Justice Frankfurter quotes D. H. Lawrence on what he calls "genuine pornography".[13]

Certainly "hard-core pornography", which unquestionably would be obscene and non-mailable, would include pictorial and written descriptions of sex perversion and of degenerate bestiality. Such material, to the Roth case's "average person" is repulsive, loathsome and abhorrent. Such a person would describe it as nasty, foul, putrid and hideous. Concededly obscene, such material would scarcely come within the Court's definition of material "which deals with sex in a manner appealing to prurient interest", or as "material having a tendency to excite lustful thoughts." Quite the contrary. For that reason we think that the material such as that extracted from Peyton Place, which we have heretofore described, although it may not be "hard-core pornography", is nevertheless material which the jury could properly find to be obscene within the definition of the Roth case. Indeed, it would appear to be hard to find passages anywhere which exceed its appeal to prurient interest.

It is argued that there was not sufficient proof of scienter. Appellant concedes that the Court in Smith v. California, 361 U.S. 147, 80 S.Ct. 215, did not precisely define just what degree of scienter is required in a case of this kind. As appellant puts it, the Smith case "left dangling" this question. The argument is made here that it was necessary to prove not only that appellant knew the contents of the materials mailed, but that he must have had a specific intent to mail what he knew and believed to be obscene literature. Such a contention was rejected in Rosen v. United States, 161 U.S. 29, 41, 16 S.Ct. 434, 40 L.Ed. 606.[14]

Appellant cannot make that contention here, for he preserved no such point at the trial. The court charged otherwise, and there were no exceptions taken or objections made.[15]

Moreover, we think that there can be no doubt as to the sufficiency of the proof in this case no matter what view is taken as to the required proof of intent and knowledge. The circumstances surrounding the establishment and the conduct of appellant's mail order business was sufficient to show not only that he knew the contents of the mailed

13. "But even I would censor genuine pornography, rigorously. It would not be very difficult. In the first place, genuine pornography is almost always underworld, it doesn't come into the open. In the second, you can recognize it by the insult it offers invariably, to sex, and to the human spirit.

"Pornography is the attempt to insult sex, to do dirt on it. This is unpardonable. Take the very lowest instance, the picture-card sold underhand, by the underworld, in most cities. What I have seen of them have been of an ugliness to make you cry. The insult to the human body, the insult to a vital human relationship. Ugly and cheap they make the human nudity, ugly and degraded they make the sexual act, trivial and cheap and nasty."

A rather full discussion of the commonly understood meaning of this term is to be found in Lockhart and McClure's article on "Censorship of Obscenity" in 45 Minn.L.Rev. 5, (Nov. 1960).

14. For a suggestion as to why it must be rejected see Kalven, "Metaphysics of the Law of Obscenity," The 1960 Supreme Court Review, University of Chicago, 1, 37.

15. The court instructed the jury as follows: "If you find from all the circumstances that the defendant had knowledge of the contents of the advertisement with which he is charged with mailing or causing to be mailed, then he had knowledge within the meaning of the law no matter what he may have thought concerning the material, that is whether it was or was not obscene." Referring to appellant's claim that he never thought he was violating the law in any respect the court charged: "That is not his question, that is your question, members of the jury".

material but he knew that he was engaged in the business of pandering to a taste for obscenity.[16]

Appellant testified that following some years of being in business with his brother which ended in failure he went to Florida and there began to look around for some way in which to make a living. He was broke. He tried operating what he called a "coin machine business"; he tried writing, but unsuccessfully; he tried selling ball point pens, also unsuccessfully, and then he thought of being a publisher. It occurred to him that mail order advertising was a promising way to get started making money without much capital, and that sex and sex education was not only important but one of the "best selling items in our society"; so he began advertising about 1958. He first advertised material appealing to women. This did not produce much. He then advertised material appealing to men, starting with some material entitled "Girl Getter" and then enlarging his advertisements and his mail order business and material, attempting to follow methods used by the big publishers, offering a line of materials and using mailing lists.

The short of it is that the appellant deliberately went into the business of selling material which the jury could properly conclude he chose to sell because, since it was material which dealt with sex in a manner appealing to prurient interest, it was a "best selling item". What he sold was, the jury would properly believe, simply dirt for dirt's sake, or as Mr. Justice Frankfurter suggested in the Kingsley Pictures case, supra, (360 U.S. p. 692, 79 S.Ct. 1362) "dirt for money's sake";—the jury could properly conclude that he was, in the words of Chief Justice Warren in the Roth case, supra (354 U.S. p. 496, 77 S.Ct. p. 1315), "Plainly engaged in the commercial exploitation of the morbid and shameful craving for materials with prurient effect". The jury could hardly be blamed if they discounted his testimony at the trial that he was engaged in a high-minded educational enterprise.

■ The appellant also argues that he could not be prosecuted under Title 18, § 1461, unless there had been previous determination that this material was non-mailable as provided in §§ 259a and 259b of Title 39 U.S.C.A. as the same were in effect prior to the return of the indictment herein. We find no basis whatever for this contention and reject it.

■ Appellant says that the question of obscenity is one of law, and not of fact, and hence not a matter properly to be submitted for jury determination;—that what is here involved is his claim of constitutional right, as a part of his First Amendment freedoms to distribute this literature. He says this can only be adjudged as a matter of law. In view of the Roth case and its express statement that the trial court in that case "followed the proper standard" and "used the appropriate definition of obscenity" in its instruction to the jury, we think it is idle to contend that the question of obscenity was not properly submitted to the jury in this case.

---

16. A contention similar to that made here was dealt with by the Court of Appeals for the Sixth Circuit in United States v. Oakley, 290 F.2d 517, 519, (cert. den. 368 U.S. 888, 82 S.Ct. 139, 7 L.Ed. 2d 87) as follows: "Defendant told of pictures seen by him while in the service. He introduced numerous publications and made reference to other media of information and entertainment currently available to the view of the public. He argues that his material was no worse than these. From his experience with these matters, he was persuaded, he says, that his enterprise was not illegal, and criminal intent was absent. We need not here pass upon the relative merits, or demerits, of defendant's wares and what may be obtained elsewhere. We decline to hold that contemporary sophistication has reached a point whereby to provide this defendant, or anyone else, with a license to prosecute the business of disseminating obscenity. It was for the jury here, under proper instructions and applying 'contemporary community standards' in the context of defendant's conduct, to determine his guilt."

# 88

 We have sufficiently disclosed in what we have said so far that we think the evidence was such as to warrant the submission of the case to the jury. Of course the whole matter does not end there; for it is well settled that in any case in which there is a claim of denial of rights under the federal constitution an appellate court is not bound by the conclusions of the lower courts or of juries but will reexamine the evidential basis on which those conclusions are founded. Napue v. Illinois, 360 U.S. 264, 271, 79 S.Ct. 1173, 3 L.Ed.2d 1217.[17]

 That case and the cases cited in it concern findings of state courts; but the same rule calling for reexamination of the evidentiary basis for such decisions is applied to findings by lower federal courts. Leyra v. Denno, 347 U.S. 556, 74 S.Ct. 716, 98 L.Ed. 948, furnishes an illustration of that sort of thing. The same approach was used by the Court of Appeals for the Second Circuit in Grove Press Inc. v. Christenberry, 276 F.2d 433, 436, where the court dealt with a finding by a Postmaster that a book was obscene within the meaning of 18 U.S.C. § 1461. The court said: "Even factual matters must be reviewed on appeal against a claim of denial of a constitutional right." This duty of review on our part we fully recognize. We have examined the record here with that duty in mind. Our own independent examination of that record convinces us that the judgment based upon the verdict below presents no constitutional infirmity.

Finally, appellant seeks to argue the proposition that § 1461 is unconstitutional, and that the Roth case was wrongly decided by a court wearing "judicial blinkers", that "Webster would have turned in his grave if he had known that obscenity had so many synonyms." Obviously this is not the court to which such an argument should be addressed.

The judgment is

Affirmed.

17. The decisions to this effect are very numerous. Some of them are cited in Napue v. Illinois. Included is a citation of the dissenting opinion of Mr. Justice Harlan in Roth v. United States, supra, 354 U.S. at p. 497, 77 S.Ct. at p. 1316, where it is stated: "I do not think that reviewing courts can escape this responsibility by saying that the trier of the facts, be it a jury or judge, has labeled the questioned matter as 'obscene', or, if 'obscenity' is to be suppressed, the question whether a particular work is of that character involves not really an issue of fact but a question of constitutional *judgment* of the most sensitive and delicate kind." The same principle was expressed for himself, Mr. Justice Frankfurter, and Mr. Justice Whittaker by Mr. Justice Harlan in his concurring opinion in Kingsley Pictures, supra, 360 U.S. at p. 708, 79 S.Ct. p. 1362. See also the separate opinion of Mr. Justice Frankfurter, 360 U.S. pp. 696, 697, 79 S.Ct. p. 1362.