**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**William GRONER, d/b/a Lucky Distributors, Defendant-Appellant.**

**No. 71–1091.**

United States Court of Appeals,
Fifth Circuit.

Jan. 11, 1972.

Rehearing En Banc Granted
March 28, 1972.

Mel S. Friedman, W. B. (Bennie) Housen, Jr., of Maley & Friedman, Will Gray, Houston, Tex., for defendant-appellant.

Eldon B. Mahon, U. S. Atty., Wm. F. Sanderson, Jr., Asst. U. S. Atty., Dallas, Tex., Frank D. McCown, Asst. U. S. Atty., Fort Worth, Tex., for plaintiff-

**552**

appellee; Henry E. Petersen, Asst. Atty. Gen., Larry E. Butcher, Atty. Dept. of Justice, Washington, D. C., of counsel.

Before THORNBERRY, MORGAN and CLARK, Circuit Judges.

THORNBERRY, Circuit Judge:

This is an appeal from the conviction of William Groner on an indictment charging him with two counts of knowingly using a common carrier in interstate commerce to transport a quantity of obscene books, in violation of Title 18, U.S.C.A., Section 1462.[1]

Groner alleges numerous errors in the district court's judgment. We find it necessary to discuss only two of these allegations and to render a decision on only one.

The government at trial introduced evidence that Groner caused the books in question to be shipped in interstate commerce from North Hollywood, California to Dallas, Texas. At the close of its case, the government presented four of the books—*Oral Orgies, Eager Mouths, First in Line,* and *Blood Orgy*—to the jury for their perusal. No expert testimony or other evidence was presented to show that the books were themed to appeal predominately to the prurient interests of its readers, went substantially beyond the community limits of candor in their description of sex and nudity, or were devoid of all redeeming social value. Although Groner presented testimony of experts in the fields of literature and psychology to the effect that none of these characteristics could be applied to the books, the jury nevertheless chose to convict him.

Groner contends that (1) the books are not obscene as a matter of law, and (2) the books themselves did not provide sufficient evidence of obscenity to sustain the jury verdict.

██ There remains little doubt that this Court is obligated to make an independent evaluation on the issue of whether the material in question is obscene.[2] The issue of obscenity involves the application of first amendment rights to the printed word. The courts, not the reasonable jury or even the majority of reasonable men, are responsible for the protection of freedom of speech. The substantial evidence test, usually employed to reinforce jury verdicts, thus cannot be utilized to apply these constitutional doctrines.

We have little trouble in finding the books involved in the instant case to be vile, filthy, disgusting, vulgar, and, on the whole, quite uninteresting. We do, however, have difficulty in equating these adjectives with the constitutional definition of obscenity.

Recent Supreme Court opinions furnish little guidance in this area. There exists between Redrup v. New York, 386 U.S. 767, 87 S.Ct. 1414, 18 L.Ed.2d 515 (1967), and United States v. Reidel, 402 U.S. 351, 91 S.Ct. 1410, 28 L.Ed.2d 813 (1971), a wide chasm of confusion, which is accentuated by frequent Supreme

---

1. The statute provides in pertinent part:
   Whoever brings into the United States, or any place subject to the jurisdiction thereof, or knowingly uses any express company or other common carrier, for carriage in interstate or foreign commerce—
   (a) any obscene, lewd, lascivious, or filthy book, pamphlet, picture, motion-picture film, paper, letter, writing, print, or other matter of indecent character; or
   (b) any obscene, lewd, lascivious, or filthy phonograph recording, electrical transcription, or other article or thing capable of producing sound . . .
   ＊　＊　＊　＊　＊

   Shall be fined not more than $5,000 or imprisoned not more than five years, or both, for the first such offense and shall be fined not more than $10,000 or imprisoned not more than ten years, or both, for each such offense thereafter. 18 U.S.C.A. § 1462.

2. Jacobellis v. Ohio, 378 U.S. 184, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964); Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); Haldeman v. United States, 10th Cir. 1965, 340 F.2d 59; Kahm v. United States, 5th Cir. 1962, 300 F.2d 78; In re Giannini, 69 Cal.2d 563, 72 Cal.Rptr. 655, 446 P.2d 535 (1968); Hudson v. United States, 234 A.2d 903 (D.C.Ct.App.1967).

Court reversals in obscenity cases, citing only *Redrup*.[3] Much of the material in these cases appears to be more disgusting than that involved in the instant case; some of the material found in the past to be obscene appears infinitely more tasteful, if such an adjective can be allowed in this area of the law.

■■ There remains, however, this Court's determination of whether the particular material involved in the instant case is obscene and hence constitutionally unprotectible, as that term is interpreted by the Supreme Court. We are fully aware of the test enunciated in Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957):

1. Whether the materials, taken as a whole, appeal primarily to the prurient interests of the average adult;

2. Whether the materials are patently offensive because they go substantially beyond the customary limits of candor in their description of sex and nudity; and

3. Whether the materials are utterly without redeeming social value.

In spite of indications to the contrary in *Redrup*,[4] we believe this test was clearly sustained in the Supreme Court's most recent pronouncement in United States v. Reidel, *supra*, wherein the Court stated, "Roth has not been overruled. It

3. Burgin v. South Carolina, 404 U.S. 806, 92 S.Ct. 46, 30 L.Ed.2d 39 (1971); Bloss v. Michigan, 402 U.S. 938, 91 S.Ct. 1615, 29 L.Ed.2d 106 (1971); Childs v. Oregon, 401 U.S. 1006, 91 S.Ct. 1248, 28 L.Ed.2d 542 (1970); Hoyt v. Minnesota, 399 U.S. 524, 90 S.Ct. 2241, 26 L.Ed.2d 782 (1970); Walker v. Ohio, 398 U.S. 434, 90 S.Ct. 1884, 26 L.Ed.2d 385 (1970); Bloss v. Dykema, 398 U.S. 278, 90 S.Ct. 1727, 26 L.Ed.2d 230 (1970); Cain v. Kentucky, 397 U.S. 319, 90 S.Ct. 1110, 25 L.Ed.2d 334 (1970); Carlos v. New York, 396 U.S. 119, 90 S.Ct. 395, 24 L.Ed.2d 303 (1969); Henry v. Louisiana, 392 U.S. 655, 88 S.Ct. 2274, 20 L.Ed.2d 1343 (1968); Felton v. City of Pensacola, 390 U.S. 340, 88 S.Ct. 1098, 19 L.Ed.2d 1220 (1968); Robert-Arthur Management Corp. v. Tennessee ex rel. Canale, 389 U.S. 578, 88 S.Ct. 691, 19 L.Ed.2d 777 (1968); I. M. Amusement Corp. v. Ohio, 389 U.S. 573, 88 S.Ct. 690, 19 L.Ed.2d 776 (1968); Chance v. California, 389 U.S. 89, 88 S.Ct. 253, 19 L.Ed. 2d 256 (1967); Central Magazine Sales, Ltd. v. United States, 389 U.S. 50, 88 S.Ct. 235, 19 L.Ed.2d 49 (1967); Conner v. City of Hammond, 389 U.S. 48, 88 S.Ct. 234, 19 L.Ed.2d 47 (1967); Potomac News Co. v. United States, 389 U.S. 47, 88 S.Ct. 233, 19 L.Ed.2d 46 (1967); Schackman v. California, 388 U.S. 454, 87 S.Ct. 2107, 18 L.Ed.2d 1316 (1967); Mazes v. Ohio, 388 U.S. 453, 87 S.Ct. 2105, 18 L.Ed.2d 1315 (1967); A Quantity of Copies of Books v. Kansas, 388 U.S. 452, 87 S.Ct. 2104, 18 L.Ed.2d 1314 (1967); Books, Inc. v. United States, 388 U.S. 449, 87 S.Ct. 2098, 18 L.Ed.2d 1311 (1967); Aday v. United States, 388 U.S. 447, 87 S.Ct. 2095, 18 L.Ed.2d 1309 (1967); Avansino v. New York, 388

U.S. 446, 87 S.Ct. 2093, 18 L.Ed.2d 1308 (1967); Sheperd v. New York, 388 U.S. 444, 87 S.Ct. 2093, 18 L.Ed.2d 1306 (1967); Cobert v. New York, 388 U.S. 443, 87 S.Ct. 2092, 18 L.Ed.2d 1305 (1967); Ratner v. California, 388 U.S. 442, 87 S.Ct. 2092, 18 L.Ed.2d 1304 (1967); Friedman v. New York, 388 U.S. 441, 87 S.Ct. 2091, 18 L.Ed.2d 1303 (1967); Keney v. New York, 388 U.S. 440, 87 S.Ct. 2091, 18 L.Ed.2d 1302 (1967).

4. In *Redrup*, the Supreme Court stressed: In none of the cases was there a claim that the statute in question reflected a specific and limited state concern for juveniles . . . . In none was there any suggestion of an assault upon individual privacy by publication in a manner so obtrusive as to make it impossible for an unwilling individual to avoid exposure to it . . . . And in none was there evidence of the sort of "pandering" which the Court found significant in *Ginzburg* [v. United States, 383 U.S. 463, 86 S.Ct. 942, 16 L.Ed.2d 31] . . . . . 386 U.S. at 769, 87 S.Ct. at 1415.

Appellant would have us infer from this language that there can be no conviction on the basis of obscenity without the presence of one of these elements—danger to juveniles, force upon unwilling adults, or pandering. No such holding can be gleaned from *Redrup*. Careful analysis of the Court's enumeration of the Justice's individual views on the standard reveals that the lowest common denominator for reversal of obscenity convictions remains the *Roth* standard, despite its minority status.

remains the law in this Court and governs this case." 402 U.S. at 354, 91 S. Ct. at 1412.[5]

■■ Knowing the legal test for obscenity and applying the same in light of recent Supreme Court decisions, however, are two entirely different matters. We are completely incapable of applying the test in the instant case. Without some guidance, from experts or otherwise, we find ourselves unable to apply the *Roth* standard with anything more definite or objective than our own personal standards of prudence and decency, standards which should not and cannot serve as a basis for either denying or granting first amendment protection to this or any other literature.

The necessity for expert testimony to establish the *Roth* elements was first explored in United States v. Klaw, 2d Cir. 1965, 350 F.2d 155. In *Klaw*, involving books and pictures much more graphically depraved than the books involved in the instant case,[6] the government chose to rest its case largely on a showing of the material itself insofar as proof of their obscene nature was concerned. The Second Circuit, recognizing that the defendant out of apparent necessity had made no claim that the material in question had any redeeming social, artistic or literary value whatsoever, nevertheless held that the lack of expert testimony on the issues of prurient appeal and community standards was fatal to the prosecution. In so doing, the Court reasoned as follows:

In this case, however, the only predicate for any conclusion about prurient appeal was the material itself, as if res ipsa loquitur. The jurors were, therefore, left to speculate. They were invited to behold the accused material and, in effect, conclude simply that it is undesirable, it is distasteful, it is disgusting. Knowing perhaps that they would not be interested in obtaining more of the material they might wonder why anyone else would, and conclude that the only answer is "prurient appeal." Because the jury was given no basis for understanding exactly how and why the material appeals to its audience, whether deviate or average person, it may too readily

---

5. Recent court opinions have adhered to this position. *E. g.*, Huffman v. United States, D.C.Cir. 1971, 470 F.2d 386 [10 Cr.L.Rptr. 2076, October 7, 1971]; Hoffman v. Carson, 250 So.2d 891 (Fla.1971); Hoffman v. Dickinson Operating Co., 468 S.W.2d 26 (Mo.1971); Court v. Wisconsin, 51 Wis.2d 683, 188 N.W.2d 475 (1971).

6. In *Klaw*, the court described the material as follows:

These "bondage" booklets usually contain some twenty to twenty-five photographs or crude drawings of females— some scantily clad, some tightly trussed, and all voluptuous—subjecting other women and men to various tortures and indignities, including violent and forcible deformation of the body, while being gagged, fettered and bound in bizarre postures. The booklets bore such titles as "Sorority Girls Stringent Initiation," "Female Doctor Forced into Bondage," "Girls Concentration Camp Ordeals," "Dominating Woman Turns Man into Girl," "Men in the Ladies Room," and the like. A text in each booklet described in a puerile and asinine fashion the activity depicted in the drawings. One booklet entitled "The Devil of Yocherwalden" pictures female "Gazi" guards subjecting female prisoners to brutal tortures at the direction of the "Gazi" commandment "Elsi Achstunk." The captives and tormentors are drawn with exaggerated female physical characteristics, clothed in tight-fitting garments, wearing black leather shoes with very high heels, and posed in unreal positions. There were also photographs of "Fighting Girls," corset and high heel shoe scenes, and girls in rubber apparel. Photographs offered for sale were in many instances taken from motion pictures said to have been recently released, such as "Blood of the Vampire," "Slaves of Carthage," and "The Mystery of the Black Whip." Amateur "bondage" photographs were often solicited. Bulletins published by Nutrix advertised its publications in various bondage series. All these materials are described to us as being "sado-masochistic," and we are referred to Krafft-Ebing's *Psychopathia Sexualis* for further elucidation.
350 F.2d at 157.

supply an explanation—"prurient appeal." Even if the jury did not consist of twelve carefully selected Anthony Comstocks, it might well believe that the predominant appeal of certain acknowledged works of art, sculpture and literature found in all our well-known museums and libraries would be to the prurient interest of the average person, or perhaps someone else. But if that be so, can we allow the censor's stamp to be affixed on the basis of an uninformed jury's misconceptions?

350 F.2d at 167.

Even with adequate proof under the average man test, there might still be problems, for the jury was charged to consider the material from the standpoint of the average man in the nation as a whole. We very much doubt whether twelve random New Yorkers can make such a judgment without being further informed about the "common conscience of the nation," if there be such a thing.

350 F.2d at 168 n. 14.

Although there is much conflict on this issue,[7] the Second Circuit's view has been followed by some courts. For example, in In re Giannini, 69 Cal.2d 563, 72 Cal.Rptr. 655, 446 P.2d 535 (1968), the California Supreme Court, finding expert testimony to be required on the issue of community standards, reasoned as follows:

Finally, even if the jury should be deemed to be a metaphysical embodiment of the "community," and therefore intrinsically cognizant of community standards, proof of community standards would nevertheless be indispensable to effective appellate review. An appellate court must reach an independent decision as to the obscenity of a material. . . . Since an appellate court certainly does not in any sense compose a cross-section of the community, it cannot effectively carry out this function in the absence of evidence in the record directed toward proof of the community standard.

\* \* \* \* \* \*

We cannot assume that jurors in themselves necessarily express or reflect community standards; we must achieve so far as possible the application of an objective, rather than a subjective, determination of community standards. An even-handed application of the criminal law, even with evidentiary guidance . . ., is sufficiently difficult in an area so confusing and intricate as obscenity. To sanction convictions without expert evidence of community standards encourages the jury to condemn as obscene such conduct or material as is personally distasteful or offensive to the particular juror. . . . "[C]ommunity standards . . . can . . . hardly be established except through experts. . . . There is no external measuring rod for obscenity. Neither, on the other hand, is its ascertainment a merely subjective reflection of the taste or moral outlook of individual jurors or individual judges. . . . Their interpretation ought not to depend solely on the necessarily limited, hit-or-miss, subjective view of what they are believed to be by the individual juror or judge. It bears repetition that

---

7. *Compare* City of Newark v. Humphres, 94 N.J.Super. 384, 228 A.2d 550 (1967) and City of Chicago v. Kimmel, 31 Ill.2d 202, 201 N.E.2d 386 (1964) *with* Dunn v. Maryland State Bd. of Censors, 240 Md. 249, 213 A.2d 751 (1965).

The government contends that the Second Circuit has since refused to follow the principles in Klaw. In United States v. Wild, 2d Cir. 1969, 422 F.2d 34, the Second Circuit did affirm a conviction based only on the introduction of the material itself. The material involved there, however, was composed of color slides depicting numerous erotic acts. The court, in its citation of and quotation from appellate and Supreme Court opinions, emphasized that they were not dealing with textual matter in which the meaning and effect of the whole would be relevant. The case can thus be compared with this Circuit's opinion in Kahm v. United States, 5th Cir. 1962, 300 F.2d 78. *See infra* note 8 & accompanying text.

the determination of obscenity is for juror or judge not on the basis of his personal upbringing or restricted reflection or particular experience of life, but on the basis of 'contemporary community standards.' "

See also Luros v. United States, 8th Cir. 1968, 389 F.2d 200.

The government contends this position ignores this Circuit's holding in Kahm v. United States, 5th Cir. 1962, 300 F.2d 78. There the Court stated:

It is plain to us that when the jury was instructed by the trial court in language such as that approved by the Supreme Court in the Roth case, it was fully capable of applying those standards and that charge to the materials shown to have been mailed here. Nothing is more common than for a jury in a case involving charges of negligence, as for example negligent homicide, to determine whether the proven conduct measures up to the standards of a reasonably prudent man. We think it may fairly be said that no amount of testimony by anthropologists, sociologists, psychologists or psychiatrists could add much to the ability of the jury to apply those tests of obscenity to the materials here present.

The Court in Kahm, however, was dealing with a circular composed entirely of isolated seedy excerpts from numerous racy novels, many of which had been found not to be obscene by the courts. The material there was graced with no plot, no character development, and no exemplification of independent literary efforts.[8]

8. The Court described the material involved there as follows:

. . . Included under the heading of "Sack's Book Reviews" are a number of brief extracts purportedly taken and quoted from books by named authors. These are not book reviews in the ordinary sense but merely quotations of particularly salacious passages in the books. One is a passage purportedly lifted from the book "Peyton Place" by Grace Metalious. Here are the passages containing a vivid description of the accomplishment of sexual intercourse between a boy and a girl: (Both were lying naked on the ground near his automobile. At first she teases him by running away and getting into the automobile, and laughing at him when she turns the car light on him to outline his nakedness. He pulls on his trousers, climbs into the car and starts the car engine when the girl turns off the ignition and immediately changes her mood to one of endearment and seduction, running her hands over his body and seeking his kisses. She then leads him down to the beach where he followed with the car robe on which they fall and embrace. What then happens is described by the author in words of impatient urging of immediate ravishment;— words which vividly portray a breathless, panting, concupiscent, cacoethes for consummation on the part of the girl, and savage eagerness on the part of the boy. Their lustful words, their sensuous body embrace are told with realistic and dramatic vividness to the point of passionate ecstasy that immediately precedes coitus.) We take it for granted that a motion picture which portrayed the consummation of a sexual act would be obscene. This mailed portion of an extract from Peyton Place is no less obscene in the sense of the definition of the Roth case.

    *    *    *    *    *

The extract from Peyton Place was accompanied by other so-called "book reviews" which were merely salacious extracts from other named books. One of these salacious extracts was taken from a book entitled "Out For Kicks." Our description of the obscene passages from Peyton Place fits this one precisely, as it does one from a book entitled "The Immortal" and still another from a purported "Nine Days to Mukalla."

Other material enclosed in the envelopes described in counts 8 and 9 may well be classified as hard-core pornography, a term we discuss hereafter. Among the so-called book reviews is a purported extract from a book entitled "The Tribe That Lost Its Head." This is a description of a savage tribal rite which the extract characterizes as loathsome and degraded. Another purported extract is from a book called "Intimacy"; it describes with unblushing detail both homosexual activity and masturbation. From "The Bitter Weed Path" and "Shadows of Shame" are taken descriptions of homosexual em-

Involved in the instant case are entire books endowed, albeit tenuously, with all the above-mentioned elements. The Court expressly excepted such a case from the principles enunciated there:

It must be recalled that we are not dealing here with the problem of what happens when a defendant is charged with improper mailing of an *entire book in which the literary, artistic or social values of the work must be considered and weighed against certain off-color passages* to determine whether the latter are so dominant as to outweigh the other features of the work as a whole. In a case of that kind expert testimony could well be of some value to the jury. . . .

300 F.2d at 84 (emphasis added).

The logic of this position is compelling. It becomes even more so when the possibility is considered that national, rather than state, community standards will be utilized to apply the *Roth* test.[9] Jurors in an obscenity case are called upon to determine contemporary community standards and must then compare the materials in question to determine whether they go "substantially beyond the limits of candor" in describing sex or nudity. Each juror is an individual —separate in his morals, experience and

taste. The only standards which govern his conduct and his judgment are his own, not those of the community as a whole, whether state-wide or national. Although such unfettered discretion is acceptable in determining questions of negligence, probable cause and intent, it has no place in determining whether material is to be armed with first amendment protection. We can come to no other conclusion under the circumstances.

██ This Court finds itself in the same position as that of the jury in such a case. We cannot take judicial notice, without even a scintilla of evidence, of what constitutes the community standard of decency at this or any other time. If such a standard exists at all, we would expect that it would be in a constant evolutionary and even revolutionary flux, the fact of which militates against our exercising uninformed judgment at any particular point in time. At best it would be a matter of pure chance as to whether we as a Court, or as individuals left to our own devices and without the aid of evidence, could determine the correct standard.

We confess that our reading is confined to books not at all analogous to the material involved in the instant case.[10] Although we have always recog-

braces. Enclosed in the same parcel of material is a discussion of "Six Tortures," including, with numerous other descriptions of revolting procedures, an account of "punitive masturbation" and "gang rape." Also in the mailed material is a copy of what was referred to in the advertisement as "Formula 14." This is an extended description of how a man may go about meeting a woman, gradually awakening her interest, and finally seducing her. 300 F.2d at 82–83.

Without going into equal detail, we deem it sufficient to point out that the material involved in the instant case is not even remotely analogous.

9. *See* Jacobellis v. Ohio, 378 U.S. 184, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964); United States v. Klaw, 2d Cir. 1965, 350 F.2d 155 (good discussion of possibility that national standard is required). *Contra* Miller v. United States, 9th Cir. 1970,

431 F.2d 655; California v. Luros, 4 Cal. 3d 84, 92 Cal.Rptr. 833, 480 P.2d 633 (Cal.1971); Mitchum v. Tennessee, 10 Crim.L.Rptr. 2079 (Tenn.Crim.App. 1971); Court v. Wisconsin, 51 Wis.2d 683, 188 N.W.2d 475 (Wis.1971).

10. We find ourselves in much the same position as that of the trial judge in United States v. Reidel, D.Cal., No. 5845-Crim., October 7, 1971, as he stated:

I haven't even seen an "X" rated movie. I occasionally may look at a Playboy magazine, but it might be in a barbershop, and that's a rare situation.

So though I personally would find that pamphlet to be obscene, my personal feelings are not to govern in this area which is an important area, because we are running into the Bill of Rights, the First Amendment, freedom of expression. It is a very, very difficult area, and I know today that you can walk down the street into one of these adult book stores and

nized the existence of such material, we have not in the past had occasion to examine it closely. This is, however, not to say that such literature has not found a certain modicum of acceptance in the community as a whole. We have only to peruse casually the titles and subject matter of many of the works found not to be obscene by the courts in recent years to see that standards of decency, or indecency, have passed us by.[11]

Feeling as we do that we cannot determine in a vacuum what the people of Dallas, Texas, the State, or the Nation consider as their limit of candor and their capacity for trash, we find ourselves completely incapable of ruling on this issue.

■ Moreover, we think evidence of the materials' prurient appeal was necessary. The material in the instant case does not appeal to the prurient interests of this Court. Indeed, we have trouble imagining its appealing to the prurient interests of any normal, sane, healthy individual. It is just too disgusting and revolting to be so classified. To allow a case to go to a jury of laymen under such circumstances is to invite the jurors' equating patent offensiveness with prurient appeal and aiding suppression simply on the basis of speculation and suspicion about the prurient appeal of material to some known, undefined person whose psyche is not known. The possibility, even the prob-

ability, that jurors would be uncommonly sanctimonious or Puritanical in such a state of affairs should be obvious to anyone who has noted the numerous defeats of jury censors at the hands of the appellate courts.

In short, we believe, as stated by the Second Circuit in *Klaw*:

The courts may have opened the floodgates for horror and filth, but if they are to be closed it should be done by the careful drafting of proper laws by our duly elected representatives, and not by a combination of zealous governmental inspectors, prosecutors, and uninformed juries. Then the potential contributors to our culture may have some slight notion of the guidelines and the risks.

\*   \*   \*   \*   \*   \*

Unless there be this protection, a witch hunt might well come to pass which would make the Salem tragedy fade into obscurity. Having in mind the alternatives of jail or freedom, courts must be aware of the facts of the "held-not-to-be-obscene" or "approved" cases, and ensure that the proof is sufficient to allow a fact finder to set this case apart from them. Otherwise it would be altogether too easy for any prosecutor to stand before a jury, display the exhibits involved, and merely ask in summation: "Would you want your son or daughter to see or read this stuff?" A conviction in

---

buy all kinds of publications that are being sold. So I don't feel that I am any judge of what is acceptable in the community today. . . .

11. Pinkus v. Pitchess, 9th Cir. 1970, 429 F.2d 416, aff'd 400 U.S. 922, 91 S.Ct. 185, 27 L.Ed.2d 183 (1970) (film depicting woman in act of masturbation) ; Walker v. Ohio, 398 U.S. 434, 90 S.Ct. 1884, 26 L.Ed.2d 385 (1970) (Lurid Sinner ; Sin Crop ; Nifties ; Peek-a-Boo, Number 4) ; Hoyt v. Minnesota, 399 U.S. 524, 90 S.Ct. 2241, 26 L.Ed.2d 782 (1970) (Business as Usual, Lady Susan's Cruel Lover, The Way of a Man With a Maid) ; Mazes v. Ohio, 388 U.S. 453, 87 S.Ct. 2105 18 L.Ed.2d 1315 (1967) (Orgy Club) ; A

Quantity of Copies of Books v. Kansas, 388 U.S. 452, 87 S.Ct. 2104, 18 L.Ed.2d 1314 (1967) (Sin Hooked, Bayou Sinners, Lust Hungry, Shame Shop, Fleshpot, Sinners Seance, Passion Priestess, Penthouse Pagans, Shame Market, Sin Warden, Flesh Avenger) ; Books, Inc. v. United States, 388 U.S. 449, 87 S.Ct. 2098, 18 L.Ed.2d 1311 (1967) (Lust Job) ; Friedman v. New York, 388 U.S. 441, 87 S.Ct. 2091, 18 L.Ed.2d 1303 (1967) (Bondage Boarding School, English Spanking School, Bound and Spanked, Travelling Saleslady Gets Spanked, Bound to Please, Heat Wave) ; Redrup v. New York, 386 U.S. 767, 87 S.Ct. 1414, 18 L.Ed.2d 515 (1967) (Lust Pool, Shame Agent).

every instance would be virtually assured.

350 F.2d at 170.

We do not view our failure to determine whether this material is obscene in the absence of expert testimony as an abdication of our judicial responsibility in this area of the law. Rather, it is the result of our realization that under the first amendment majority censors of one branch of our government should not and cannot be replaced by the minority suppressors of another branch, limited in their discretion only by their personal concepts of morality and taste.

We wish to make it perfectly clear what we hold, and what we fail to hold today in the instant case. We have expressed no opinion on the issue of whether the material involved here is or is not obscene. In fact, our inability to do so is the basis for our holding that expert testimony is required on the elements of obscenity in order to furnish juries and this Court with an objective basis for deciding on the issue of first amendment rights.

We are not prepared to go so far as to say that introduction of such evidence is necessary on *all* the elements of obscenity in *all* such cases. In some circumstances, the questioned material might be so terribly depraved and so lacking in candor that anyone would know without question that the community norm had been forsaken in the writer's quest for sexual sensationalism. Moreover, under some circumstances, the appeal of the material could *only* be to the prurient interests of its readers, such as that found in Kahm v. United States, *supra.* We hold only that the material involved in the instant case does not reach this "plateau" of degradation.

Thus, until the Supreme Court is able to formulate objective standards in this subjective area of the law, this Court will at least seek to base its judgment as much as possible on objective facts.[12] The government's burden of proof in these prosecutions necessitates its furnishing these facts to the Court.

Because of our holding that the government has failed to carry its burden on the three elements of obscenity enunciated by the Supreme Court in *Roth,* we reverse the judgment of conviction and remand the cause for a new trial.

CLARK, Circuit Judge (concurring):

Judge Thornberry's opinion is an excellent and absolutely accurate summation of the law as announced by present federal court decisions fixing (or more aptly, failing to fix) the respective limits of "free press" rights under the First Amendment and unprotected publications which exploit sexuality. However, as his opinion convincingly demonstrates, the judiciary has created a quagmire. Our recognition that a jury must have the opinion evidence of obscenity "experts" may very well compound, rather than aiding in solving, the dilemma.[1]

If I were not bound by these mutable precedents, I would unhesitatingly abandon the "national standard" concept and return the problem of what is unprotected hard-core prurience to the fifty individual laboratories—the States—which make up our united republic, with every confidence that they will protect federal Constitutional guarantees better than we. The chance that the traditional

12. Many believe that there can be no objectivity in the obscenity area. One commentator has thus stated:
There is no definition of the term [obscenity]. There is no basis of identification. There is no unity in describing what is obscene, or in prosecuting it. There is little more than the ability to smell it.

Albert, Judicial Censorship of Obscene Literature, 52 Harv.L.Rev. 40, 47 (1938).
This Court, however, will continue to search for an objective criterion for determining what is obscene and refuse to depend on its nose for judgment.

1. See our divided opinion in United States v. Williams, 447 F.2d 1285 (5th Cir. en banc 1971).

blue-nosed, puritanical Boston censor will ban a publication that ought to be protected, is far outweighed in my mind by the potential harm of the progeny which may follow a judicial foisting of the permissive licentiousness thought by some "expert" to be the majority standard elsewhere upon the citizens of that city.

One more observation and I am done. I understand that the First Amendment protects publications and talk and only limited forms of action. But, I cannot fathom the logic of a legalism that asserts that this Amendment, which became a part of our Constitution in 1790, was ever intended, then or now, to mean that the several States may punish a nude female dancer in a private club who climaxes her performance by exposing her sex organs for indecent exposure[2] while at the same time protecting an entrepreneur who films the illegal scene and sells it to the adult public at the same club. If reason is really the life of the law, as I conceive it to be, both classes of action ought to be State responsibilities. That is one function the simultaneously proposed and ratified Tenth Amendment would perform if we would but let it.

Reluctantly, I concur.

## ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

Before JOHN R. BROWN, Chief Judge, and WISDOM, GEWIN, BELL, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, DYER, SIMPSON, MORGAN, CLARK, INGRAHAM and RONEY, Circuit Judges.

BY THE COURT:

A member of the Court in active service having requested a poll on the application for rehearing en banc and a majority of the judges in active service having voted in favor of granting a rehearing en banc.

It is ordered that the cause shall be reheard by the Court en banc on briefs without oral argument. The Clerk shall set a briefing schedule for the filing of supplemental briefs.

Judge GOLDBERG dissents to submission on briefs without oral argument.

2. See Hoffman v. Carson, 250 So.2d 891 (Fla.); Appeal dismissed for want of a substantial federal question, 404 U.S. 981, 92 S.Ct. 453, 30 L.Ed.2d 365 (1971).