Lawrence **LANDRY** et al., Plaintiffs,

v.

Richard J. **DALEY**, Mayor of the City of Chicago, Cook County, Illinois; James Conlisk, Superintendent of Police of the City of Chicago, Illinois; John S. Boyle, Chief Judge of the Circuit Court of Cook County, Illinois; John J. Stamos, State's Attorney of Cook County, Illinois; Raymond F. Simon, Corporation Counsel of the City of Chicago, Illinois; Joseph I. Woods, Sheriff of Cook County, Illinois; Richard J. Elrod, Assistant Corporation Counsel, City of Chicago, Division of Ordinance Enforcement; Maurice W. Lee, Magistrate, Circuit Court of Cook County, Illinois; John S. Limperis, Magistrate, Circuit Court of Cook County, Illinois; John T. Burke, Joseph Ratkvich and Robert Kulovitz, Police Officers of the City of Chicago, Defendants.

No. 67 C 1863.

United States District Court
N. D. Illinois, E. D.
March 27, 1968.

See also D.C., 280 F.Supp. 938; D. C., 288 F.Supp. 189; D.C., 288 F.Supp. 194; D.C., 288 F.Supp. 200.

Jerome E. Wexler, Asst. Public Defender, Chicago, Ill., for petitioners.

Richard J. Elrod, Asst. Corp. Counsel, City of Chicago, Chicago, Ill., for respondents.

## MEMORANDUM OPINION

WILL, District Judge.

On March 4, 1968, this Court declared two ordinances of the City of Chicago unconstitutional, D.C., 280 F.Supp. 968, Chapter 193, Section 1 of the Municipal Code entitled "Disorderly Conduct," and Chapter 11, Section 33 thereof, dealing with resisting an officer. On March 18, 1968, a prospective injunction was entered effective March 20, 1968, proscribing any future enforcement of the ordinances in question or the institution of any new prosecutions thereunder. At the same time the Court announced that it would make *ad hoc* determinations in those pending cases brought to its attention as to whether there was probable cause for prosecution of conduct constituting a breach of the peace or whether they involved solely activities protected by the First Amendment to the United States Constitution.

The first and only such case currently before the Court involves two individuals, Esse Wells and Donald Weatherall, charged under both ordinances because of their conduct on September 20, 1967 at a so-called "tent-in" held on the northeast corner of Pulaski and Roosevelt roads on that date. Petitioners Wells and Weatherall seek to have their prosecutions enjoined on the ground that the ordinances have been held unconstitutional and that, in any event, they were merely exercising their rights to speak, assemble and demonstrate at the time.

As to the first ground, the Court has already indicated that, with respect to prosecutions pending on March 20, 1968, the effective date of its injunction, it would not enjoin all further proceedings therein but only those in which there appeared to be no probable cause. We turn then briefly to the relevant facts adduced at the hearing held March 21, 1968, at which a number of witnesses, including petitioners, other demonstrators and police officers testified as to their recollection of the events. Inevitably there is conflict as to what occurred, but for purposes of this proceedings, we must take the evidence most favorable to the prosecution since we are not here engaged in determining the guilt or innocence of the petitioners but merely whether there is probable cause for their prosecution.

The foregoing point cannot be emphasized too strongly. It is not this Court's province or prerogative to try the pending state charges. We are called upon merely to ascertain whether those prosecutions are solely infringements of constitutionally guaranteed rights under the First Amendment or whether there is some evidence of conduct by the petitioners not so protected which would constitute probable cause for prosecution. Nothing said herein is intended to or does imply any opinion as to any issue other than that narrow question.

Generally, and taken most favorably from the point of view of probable cause for prosecution, the evidence is that on the morning of September 20, 1967, pursuant to a previously developed protest plan, a number of residents of the immediate Pulaski-Roosevelt community proceeded to erect a large canvas tent on the vacant lot located on the northeast corner of the intersection. Their purpose was to dramatize the sub-standard housing in the slum buildings in the area. It was planned that Mrs. Wells and her six small children would occupy the tent. To this end some cots, mattresses, and a few other pieces of furniture were brought to the lot in addition to the tent.

The project first came to the attention of the police when Sergeant Frank O'Connor, on routine squad car patrol, saw the tent in process of erection about 9:30 A.M. He notified his superiors and was told to stand by and await further orders. The Corporation Counsel's office was contacted and additional police were assigned to the scene. At approximately 10:40 A.M., Captain Ronald

Nash, the Acting Commanding Officer of the District, after ascertaining that the demonstrators had failed to secure a building permit for the erection of the tent, advised them that they would have to dismantle it within one hour. When those erecting the tent continued to put it up, Captain Nash instructed Sergeant O'Connor to note the individuals disobeying his orders for possible future arrest.

During this period, from 9:30 to 10:40 A.M., the number of people in the vicinity, some of whom were involved in the demonstration and others of whom were merely spectators, increased from 15 or 20 to 50 or 60. By 11:40 A.M., when Captain Nash's deadline expired, the crowd numbered between 150 and 175. A number of women and children were inside the tent which was open from the roof level down. Other demonstrators and spectators were on the lot and the sidewalks. In addition to Captain Nash and approximately 15 policemen, Assistant Corporation Counsel Richard Elrod was also present.

Among the women and children inside the tent was Mrs. Wells and her six. Mr. Weatherall, who had been at the scene earlier, had left and did not return until later.

Notwithstanding Captain Nash's ultimatum, the dismantling of the tent was delayed because the crew from the Sanitation Department of the City had not yet arrived at 11:40, but appeared about 15 or 20 minutes later. In the interim, Captain Nash ordered the arrest of those who had been erecting the tent and who had continued to do so in the face of his orders to them to dismantle it. This understandably caused some negative reaction in the assembled crowd, as the five individuals were placed in the squadrol parked on the east side of Pulaski north of Roosevelt.

About this time the Sanitation Crew arrived and was instructed to proceed to take down the tent. The women and children in the tent were asked to leave so as to obviate any possible injury and all did so. While the tent was in the process of being dismantled, Mrs. Wells apparently changed her mind, went back inside and sat down on a cot.

Sergeant O'Connor then asked her to leave and she responded in a loud voice with an obscenity. Mrs. Wells, it should be noted, is normally a clearly audible, outspoken woman, and her natural volume and freedom were apparently alcoholically enhanced on the occasion. A second request by Sergeant O'Connor that she leave was met with an embellished version of the original obscenity whereupon he placed her under arrest. When he attempted to escort her from the tent to the squadrol, she resisted, and it took several officers, while she protested loudly, to half-guide, half-drag her to the police vehicle.[1]

At about this time Mr. Weatherall returned to find five of the demonstrators already under arrest, the tent coming down, Mrs. Wells in the process of being arrested, and a crowd of 150 to 175 people somewhat restive but more or less just observing. He proceeded to harangue them with exclamations such as "They can't do this," "Are you going to let them get away with this?" "We don't have to put up with this," etc.

When Weatherall saw Mrs. Wells being forceably escorted from the tent by the police, he turned from the crowd towards her and attempted to reach her but was blocked by a line of policemen which had formed so as to clear a passage to the squadrol. Their backs were to Weatherall and when he reached them he turned towards the tent and shouted at Captain Nash, "Why is she being arrested?" "You have no right to make any arrests." Captain Nash told him to be quiet and Assistant Corporation Counsel Elrod likewise urged him to quiet down.

---

1. Mrs. Wells' version of the episode is, of course, totally different. As indicated previously, we are not passing on whose recollection is correct but merely on whether the evidence taken most favorably to the city constitutes probable cause for prosecution.

Instead, he went back to exhorting the crowd some of whom by now had taken up his cries and were repeating them. Captain Nash thereupon went over to him and placed him under arrest. Weatherall attempted to pull away into the crowd and Lieutenant Martin Gannon who observed the maneuver went around behind the Captain and, with other police officers, took hold of him. Weatherall thereupon went limp and had to be physically carried to the squadrol.[2]

Captain Nash then addressed the crowd, explaining that the erection of the tent without a permit was improper and urging them to disburse. The sanitation crew finished dismantling the tent, the crowd broke up and the demonstration was over.

As previously noted, both petitioners were charged with violating the ordinances proscribing disorderly conduct and resisting or interfering with a police officer in the discharge of his official duties, including making an arrest. Also, as previously noted, we deal here not with the question of their guilt or innocence under those charges but solely with whether there is evidence, taken most favorably to the city, which constitutes probable cause for their prosecution or whether such evidence indicates that they were engaged only in speech or conduct which is constitutionally protected.

Turning first to the disorderly conduct charge against Mrs. Wells, the evidence is that in response to two orders by Sergeant O'Connor to vacate the tent so as to avoid any injury to her as it was being dismantled, she not only refused but did so in loud and obscene language heard by at least two of the officers present, Sergeant O'Connor and Lieutenant Gannon.

It is well established that arguing or disputing with a policeman is not per se disorderly conduct or a breach of the peace. The Illinois Appellate Court has described the duty of a police officer in dealing with a citizen as follows:[3]

"An officer of the law must exercise the greatest degree of restraint in dealing with the public. He must not conceive that every threatening or insulting word, gesture, or motion amounts to disorderly conduct. It may be of such a character or so provoked or conditioned as to be fully justified. City of Jacksonville v. Headen, 48 Ill.App. 60; Pinkerton v. Verberg, 78 Mich. 573, 44 N.W. 579, 7 L.R.A. 507; Heath v. Hagan, 135 Iowa 495, 113 N.W. 342.

\* \* \* \* \* \*

"It is apparent from this statement of the law that words addressed to an officer in an insolent manner do not without any other overt act tend to breach the peace because it is the sworn duty and obligation of the officer not to breach the peace and beyond this to conduct himself so as to keep others from so doing." 123 N.E.2d at 151.

While arguing with a policeman is not per se a breach of the peace or disorderly conduct, depending on what is said, it may be bad manners or worse tactics and, if obscene language is used in a public place within the hearing of others, may constitute a breach of the peace and disorderly conduct. The First Amendment does not protect obscene public utterances.[4] Similarly, a loud and violent refusal to obey a lawful police order may be a breach of the peace.

Applying the foregoing principles to the instant case, it is apparent that there is evidence Mrs. Wells was not engaging solely in protected conduct. Whether the ultimate trier of fact accepts Mrs. Wells' and her fellow demonstrators' recollection of what occurred or

2. Again it must be noted that Mr. Weatherall and Miss Latimore's recollections of what occurred are contrary but the foregoing summarizes the evidence most favorably to the city.

3. Oratowski v. Civil Service Commission of City of Chicago, 3 Ill.App.2d 551, 123 N.E.2d 146 (1st Dist. 1954).

4. Chaplinsky v. State of New Hampshire, 315 U.S. 568, 572, 62 S.Ct. 766, 86 L.Ed. 1031 (1941).

that of the police officers will, of course, determine her innocence or guilt of the charge. We find only that there is no basis for enjoining her prosecution on the disorderly conduct charge.

As to the resisting an officer charge, there is evidence that after her arrest by Sergeant O'Connor, Mrs. Wells attempted on one or more occasions to break away from the arresting officers and had to be foreceably escorted to the squadrol. She and Miss Latimore deny this and assert that she walked voluntarily to the police vehicle. Again, we do not weigh the evidence but conclude only that there is evidence which constitutes probable cause for prosecution.

■ Mr. Weatherall's conduct presents a different and more difficult question, the interplay and balance between the individual citizen's right to freedom of speech and the state's duty to preserve the peace, to maintain an orderly society. The determination as to when the exercises of free speech becomes a sufficient threat to order so as to constitute disorderly conduct and justify its suppression is a difficult value judgment, varying from case to case, and demanding great sensitivity. No precise guidelines can be set down. The "clear and present danger" standard is a noble concept but, unhappily, incapable of objective definition. Accordingly, each episode must be judged on its own facts.[5]

To illustrate further the complexity of such a value judgment, it is inevitable that the legitimate exercise of freedom of speech and assembly will frequently arouse emotions, and particularly anger. The men who wrote the First Amendment were acutely aware of this for the speeches of Patrick Henry, John Adams, Benjamin Franklin and others, which stirred their fellow citizens to anger, played a vital role in the birth of this nation. And throughout our history, similar exhortations, whether by political, religious or other leaders, have contributed greatly to our attempts to make reality of our ideals. This is an election year and, in the best American tradition, we shall hear many utterances as to the state of the nation, some of which will be calculated to arouse us to anger.

The inevitable implications of free speech have likewise been recognized by the courts on numerous occasions.[6] In Terminiello v. City of Chicago, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949), for example, a case arising under the same ordinance here involved, the Supreme Court pointed out that "a function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging." 337 U.S. at 4, 69 S.Ct. at 896.

■ Conversely, it is equally clear that speech may be suppressed when it constitutes an imminent danger of causing a breach of the peace.[7] The difficult and crucial question is to determine when that moment has occurred in any

---

5. Apparently, in recognition of these difficulties, the City has adopted the laudable practice of dispatching to the scene an Assistant Corporation Counsel, representatives of the Commission on Human Relations, and others trained in this area to advise the police whose natural instinct understandably is to anticipate the worst and act accordingly. While their consensus may not always achieve the proper balance, the technique is certainly a step in the right direction.

6. See Cox v. State of Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965);

Edwards v. South Carolina, 372 U.S. 229, 237–238, 83 S.Ct. 680, 9 L.Ed.2d 697 (1962); Terminiello v. City of Chicago, 337 U.S. 1, 4–5, 69 S.Ct. 894, 93 L.Ed. 1131 (1949).

7. See Bridges v. State of California, 314 U.S. 252, 261–262, 62 S.Ct. 190, 86 L.Ed. 192 (1941); Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470 (1919); Abrams v. United States, 250 U.S. 616, 627–629, 40 S.Ct. 17, 63 L.Ed. 1173 (1919) (dissenting opinion).

## 189

given situation. Obviously, the initial determination will have to be made on the spot by the police and their advisors. Given the importance, the complexity and the sensitivity of such decisions, too much training and expertise cannot be brought to bear on them. Thereafter, these on-the-spot decisions are subject to judicial review in both trial and appellate courts where a more detached evaluation of them can be made. Hopefully, through this process, a fair balance between maximum protection of the rights guaranteed by the First Amendment and the necessity for preserving an orderly society will be maintained.

How does all of this apply to Mr. Weatherall's disorderly conduct prosecution? Is there any evidence that his speech was creating an imminent danger of a breach of the peace? Again, we do not decide the ultimate question of his guilt or innocence or if the police correctly evaluated the situation.

■ The evidence discloses that Mr. Weatherall's exhortations to the crowd were generating increasing response and tension. Both Assistant Corporation Counsel Elrod and Captain Nash allegedly requested that he subside. The nature of his remarks was such that a breach of the peace might have resulted, although at no time apparently did he exhort the crowd to specific action. This is obviously the type of case where the detached judicial review of the on-the-spot judgment in the light of all the evidence which may be presented at a full trial will be significant. For purposes of our limited consideration, however, it is sufficient to say that probable cause exists for prosecution.

■ The final charge which we are asked to enjoin is that against Mr. Weatherall for resisting. In the light of the evidence that after his arrest he had to be carried physically to the police vehicle, there is obviously probable cause for prosecution.

For the reasons heretofore set forth, the petitions of Esse Wells and Donald Weatherall for injunctions against the further prosecution of the pending charges against them arising out of the occurrences at Roosevelt and Pulaski Roads on September 20, 1967, will be denied. An appropriate order will enter.