William VON SLEICHTER, Appellant,

v.

UNITED STATES of America, Appellee.

No. 24456.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 24, 1972.

Decided June 15, 1972.

Rehearing Denied Aug. 4, 1972.

---

Mr. William A. Dobrovir, Washington, D. C. (appointed by this court), for appellant.

Mr. John O'B. Clarke, Jr., Washington, D. C., with whom Messrs. Thomas A. Flannery, U. S. Atty. at the time the brief was filed, and John A. Terry, Asst. U. S. Atty., were on the brief, for appellee.

Messrs. John Vanderstar and Ralph J. Temple, Washington, D. C., filed a brief on behalf of The American Civil Liberties Union Fund of the National Capital Area, as amicus curiae.

Before WRIGHT, LEVENTHAL, and MacKINNON, Circuit Judges.

LEVENTHAL, Circuit Judge:

This case comes before us following allowance of appeal from the District of Columbia Court of Appeals (DCCA). See 267 A.2d 336 (1970). Appellant appeals his conviction for possession of

heroin. The facts are these: one evening, appellant was standing in the shadows of a building in Georgetown in the company of two other young men. A police officer observed the three from across the street and noticed that their hands were "passing and changing" among them. Since this area is considered by the police to be "high in narcotic traffic," the officer decided to investigate. Crossing the street, he approached the three men. Appellant began to walk rapidly away. The officer called out to him, "I would like to talk with you a minute." Appellant then shouted "fuck you" and ran. There were pedestrians within earshot at the time. The officer gave chase and apprehended appellant one and one-half blocks away, with the assistance of pedestrians, when appellant attempted to crawl underneath a Volkswagen parked at curbside. The officer informed appellant that he was under arrest for disorderly conduct and ordered him to place his hands in view. Appellant ignored this command. After appellant ignored a second such command, the officer told him to "bring his hands out" from under his stomach, or the officer would help him bring them out. Appellant then obeyed. On the ground where he had been lying was a bag of heroin, in plain view.

There was no opinion for the DCCA, since Judge Gallagher dissented, and the votes of Judges Nebeker and Kern for affirmance were based on distinctly different legal premises.[1]

■■ While disorderly conduct is a crime without physical evidence or fruits,[2] a policeman apprehending the possibility of danger may conduct a search incident to a lawful arrest for disorderly conduct for the purpose of dis-

covering and removing weapons, and may command the person arrested to place his hands where they could be seen. When such a command was given to appellant, it constituted a search of his hands, but a valid search. Once that lawful command was obeyed, the heroin was in plain view. See Harris v. United States, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968). The central question is whether the arrest was lawful. We hold that it was, and that the search for weapons, incident to a valid arrest, was likewise lawful.

Appellant maintains that the arrest which was the predicate for the search cannot be sustained as valid. While the four-letter expletive may at one time have warranted arrests, it has now, he says, become so commonplace that it has been drained of offensiveness—that time and contemporary usage have leached the word both of meaning and shock value. He relies on the precedents of Williams v. District of Columbia, 136 U.S.App.D.C. 56, 419 F.2d 638 (en banc 1969), and Cohen v. California, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971).

■ This contention reads *Williams* too narrowly. The court interpreted the statute (22 D.C.Code § 1107) prohibiting, as disorderly conduct, the utterance on a street of "indecent or obscene words," as requiring as an element of the offense either (a) that these words be spoken in circumstances which create a threat of violence, or (b) that the language "is, under 'contemporary community standards,' so grossly offensive to members of the public who actually overhear it as to amount to a nuisance." 136 U.S.App. D.C. at 64, 419 F.2d at 646 (footnotes omitted). There is a state interest "in protecting the sensibilities of passers-by"

1. Judge Nebeker considered that the policeman's order was sustainable under Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), on the ground that the situation merited investigation, the policeman's order was appropriate for his own protection and that it was irrelevant whether the policeman had already arrested his suspect or whether he had

probable cause for such arrest. Judge Kern took the position that the drugs appeared as the result of a search that was valid because incident to a valid arrest for disorderly conduct. We affirm on the ground set forth in Judge Kern's opinion.

2. *See* United States v. Mills, 153 U.S.App. D.C. ——, 472 F.2d 1231 (en banc 1972).

against shock, see Street v. New York, 394 U.S. 576, 591, 89 S.Ct. 1354, 1365, 22 L.Ed.2d 572 (1960), and this does not depend on a showing of any tendency to result in violence.[3] *Williams* notes, with reference to the ALI's Model Penal Code, that the statute is directed to a public annoyance, and is not applicable merely because a policeman's peace and quiet are disturbed. This narrowing construction avoids the constitutional infirmity of facial invalidity, *cf.* Gooding v. Wilson, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972).[4]

Appellant's words were in a context that is pertinent. We are not to be taken as suggesting that these words would suffice for an arrest if uttered, to take the hypothetical case put in *Williams*, by a "hapless stonemason" who accidentally stubs his toe, and whose spontaneous profanity is patently devoid of any possible offense. But appellant's words were in response to an officer's civil inquiry, a request for cooperation that may lawfully and reasonably be directed to citizens at large without any charge of crime. It is one thing to say that a citizen's cooperation is a moral duty rather than a legal duty that can be compelled.[5] It is quite another to contend that the Constitution provides an immunity from arrest for a person who chooses to manifest his unwillingness to cooperate with the shout of a four-letter expletive on a public street, within earshot of passers-by. His primary verbal target may have been the officer; but he cannot stake out a constitutional right to disregard shock on the passers-by.

We are not here deciding that appellant was guilty of disorderly conduct, or even that the policeman's account necessarily establishes appellant's guilt if unrefuted. The trial of these cases may come to balance the interests of free speech and good order. The ultimate balancing of these interests, often delicate and difficult, must take place in court rather than on the beat. The *Williams* rationale is sufficient to establish probable cause for the arrest of appellant for disorderly conduct.

Cohen v. California is distinguishable. It involved a written, rather than a shouted, sentiment. Justice Harlan took note of this when he said that people who might be offended could avoid distress by modestly "averting their eyes." 403 U.S. 15 at 21, 91 S.Ct. 1780. Even as a written word it was part of a political statement concerning the draft, and the kind of language that may be held protected by the First Amendment in that context, with its paramount "redeeming social value," may not be protected in another context where its coarsely offensive nature is unrelieved.

■ In upholding the search on the basis of a valid arrest for disorderly conduct, we have fully in mind that such an arrest is dependent on a showing by the Government of probable cause to

---

3. "Coarse or indecent language is penalized . . . regardless of any actual or presumed tendency to evoke disorder among the hearers, since the interest we seek to protect is freedom from present nuisance rather than freedom from anticipated violence." Model Penal Code § 250.1, Comment at 7 (Tent. Draft No. 13, 1961).

4. *Gooding* considers the specificity required of a statute necessary to sustain a conviction for fighting words, because the language has a "direct tendency to cause acts of violence by the person to whom, individually, the remark is addressed." It does not discuss in any way the separate problem of the use in public of words so grossly offensive as to amount to a nuisance. The Supreme Court held the state court decisions had not narrowed the construction of the overbroad statute. In this jurisdiction, *Williams* has provided that narrowing construction.

5. As Judge Danaher noted, while an officer may ask questions, the person may decline to talk, see Green v. United States, 104 U.S.App.D.C. 23, 259 F.2d 180 (1958). While this fact, or even flight, is not ground for arrest, it may be taken into account along with other evidence in considering whether there is ground for a stop or probable cause for arrest. As already noted (*supra*, note 1) we do not determine in this case whether there was a basis for detention on a narcotics charge.

make the arrest. See Wrightson v. United States, 95 D.C. 390, 222 F.2d 556 (1955). Nor do we shrug off appellant's contention that his shouted response is today a bland and obsolete expletive, debased by overuse to non-meaning, and without the potential of being coarsely offensive. But the requirement on the Government to support the validity of the arrest is rooted in practical common sense and reasonableness, as was aptly noted by Judge Wright, for the court, in Bailey v. United States, 128 U.S.App.D.C. 354, 357–358, 389 F.2d 305, 308–309 (1967) (omitting citations):

> Probable cause is a plastic concept whose existence depends on the facts and circumstances of the particular case. It has been said that " '[t]he substance of all the definitions' of probable cause 'is a reasonable ground for a belief of guilt.' " Much less evidence than is required to establish guilt is necessary. The standard is that of "a reasonable, cautious and prudent peace officer" and must be judged in the light of his experience and training. The police must have enough information "to warrant a man of reasonable caution in the belief" that a crime has been committed and that the person arrested has committed it. A finding of probable cause depends on the "practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act."

The essence of the requirement of a showing of probable cause in case of arrest without a warrant is that it requires the police officer involved to go beyond intuitive suspicion, and bring forward "a substantial objective basis for believing that the person to be arrested has committed a crime." [6] What the officer brought forth in the case at bar was not mere intuition but objective factors that sufficed, we think, to show probable cause to believe that a misdemeanor had been committed in the officer's presence, by a man now running away, hence to show the validity of the arrest.

As to the case at hand, the officer had been on foot patrol on this beat—carney block 108 (from Wisconsin Avenue to 30th Street, and from N to R Streets) —for approximately three months when this incident took place in front of 3146½ O Street, Northwest, at approximately 8:15 p. m. on October 3, 1969. The reason why the officer wanted to talk to appellant was, concededly, only a suspicion—a suspicion of drug traffic. And the officer was aware, he testified, that the appellant was not required to answer him and was free to depart. (Transcript, p. 12). But appellant did not merely depart. He also shouted what the officer referred to as these "profane words," when there were five or six citizens within hearing range (transcript, p. 12), and began to run.

In the DCCA, Judge Gallagher dissented on the ground that the officer "said he did not know whether any had even heard the obscenity." [267 A.2d 342] With all respect, this is too technical an approach to a problem that all concede must be looked at in terms of reasonableness and practicalities. Of course the policeman did not take time to canvass the passers-by to learn whether they had in fact been offended. The appellant was running away. The officer had to act immediately or not at all. Nor was he required, on apprehending defendant some blocks away, to return to the original scene for an interview with the spectators. The fact that they had in the meanwhile gone about their business would not undercut the arrest. The officer's own experience—which included service in this area—led him to consider these words as "profanities." He was required to bring forward the reason for his arrest, but once he had done this, the arrest is not to be upset as unlawful unless there is a judicial determination that it was without probable cause.

6. American Law Institute Model Code of Pre-Arraignment (Tent.Draft No. 2, 1969) § 3.01.

We reiterate that we are not deciding that defendant was guilty of disorderly conduct, a decision that would require a determination concerning community standards. The standard that governs arrest does not require proof enough to convict. The police officer's probable cause for arrest may stand even though the prosecutor needs additional evidence for the preliminary hearing or the trial.

We are aware that conventions and fashions in language change. But we do not think that it can be doubted that these words have at least some minimal shock quality—we would recognize that well enough if they were shouted in a courtroom, or even a court corridor—that is sufficient to allow a criminal proceeding to be begun. And that is what is involved in the validity of an arrest. Indeed, there is implicit recognition of such shock value in another of appellant's arguments—that cursing is a useful safety-valve for pent-up hostility; that there is a cathartic charge in using words with a shock value, which justifies the use of such language in the service of a broader public interest. Whatever therapeutic claims may be made for this safety-valve in the context of language spoken solely to a policeman, or in private, we do not see it as establishing a license to shout shocking and offensive expressions on the public streets, without regard to public annoyance.

Anything is possible; it is possible that this policeman was an old-fashioned fuddy-duddy who was not aware that the shockers of yester-year are today's common idiom on the residential streets of Georgetown. But as *Bailey* and many other cases [7] reiterate—over and over again—the question is, not what would be held at a trial on the merits, but what it was reasonable for the policeman to do in the circumstances. We must give some credit to the policeman for ability to assess the ordinary impact of the sights and sounds he hears, at least for the purposes of an initial determination on his part to make an arrest, and subject to whatever might be brought out on cross-examination or rebuttal at a preliminary hearing or trial. We are not prepared to lay down a rule that there is such a constitutional privilege to shout four-letter words on a public street that a policeman who explains that he had made an arrest for the shouting of such language within hearing of citizens on the street must be held to have failed to show probable cause. We think the record before us does not permit us to vitiate the arrest for disorderly conduct.[8]

Affirmed.

J. SKELLY WRIGHT, Circuit Judge, dissenting:

I share the majority's reluctance to affirm this conviction on the basis of the views expressed by Judge Nebeker. *See* majority opinion at 1246 n. 1. I had

---

7. *E. g.*, Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); Lewis v. United States, 135 U.S.App.D.C. 187, 417 F.2d 755 (1969); Davis v. United States, 133 U.S.App.D.C. 172, 409 F.2d 453 (1969); United States v. Heitner, 149 F.2d 105 (2d Cir. 1945).

8. We are certainly not precluded from sustaining an arrest on the ground set forth by the arresting officer, merely because the prosecutor—for reasons of his own, perhaps tactical—sought to uphold the search on a broader ground, that would not depend on the existence of a valid arrest.

   We need not inquire as to the procedural problem that may be involved

when an arrest made for one violation is defended on the basis of another. Here, the arrest was for disorderly conduct, and we hold that there was probable cause for disorderly conduct violation.

Neither Judge Gallagher dissenting in the DCCA, nor appellant before us—who was spirited both in brief and oral argument in challenging the position taken by Judge Kern's opinion—made any claim that Judge Kern's opinion was objectionable as sustaining the validity of the arrest on a ground as to which appellant had counter-evidence that he had not fairly been given the opportunity to present.

not thought that anything in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed. 2d 889 (1968), changed the long-standing rule that evidence resulting from a search incident to an unlawful arrest is inadmissible. Nor had I doubted that when a policeman on the beat announces, "You are under arrest," he means what he says, and his words are sufficient to effect an arrest.[1] It follows that, if the arrest is invalid, the incident search is invalid as well, even if it is confined to the sort of superficial frisk which would have been permissible following a *Terry* stop. *See* Clarke v. United States, D.C. C.A., 256 A.2d 782, 786 n. 7 (1969). Any less stringent rule would mean that whenever the police had the reasonable suspicion necessary for a *Terry* stop, they could instead arrest the suspect and subject him to all the indignities which an arrest implies without losing the benefit of the evidence seized so long as that evidence might have been uncovered by a superficial frisk. As this court said in United States v. Cunningham, 138 U.S.App.D.C. 29, 30, 424 F.2d 942, 943, cert. denied, 399 U.S. 914, 90 S.Ct. 2218, 26 L.Ed.2d 572 (1970): "A lack of probable cause cannot be made up in hindsight by a hypothetical variation in the basis on which a search was conducted." *Cf.* United States v. Morris, 142 U.S.App. D.C. 196, 197, 440 F.2d 224, 225 (1970).

I do not agree, however, that this conviction may be rehabilitated on the *post hoc* theory that probable cause existed for a disorderly conduct arrest.[2] Nor do I approve the majority's cavalier treatment of appellant's argument that the words he spoke were not in that context so offensive as to justify an arrest under the principles explained in Gooding v. Wilson, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972), Cohen v. California, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971), and Williams v. District of Columbia, 136 U.S.App.D.C. 56, 419 F.2d 638 (1969) (*en banc.*) Although the majority concedes that "conventions and fashions in language change," it nonetheless proceeds to hold that appellant's words still retain "shock quality." In so doing, my brothers resolve a question of fact about which this court has no expertise and on which no record was made below.

In my view, it is not the function of judges to decide on the basis of their own sensibilities which words retain "shock quality" and which "are today's common idiom." No case that I know of authorizes use of the judicial process to figuratively wash out the mouths of criminal defendants who use language which some judge, on his own, considers "dirty" or "offensive."[3] Writing only a few months ago in Huffman v. United States, 152 U.S.App.D.C. 238, 248, 470 F.2d 386, 396 (decided October 7, 1971), Judge Leventhal warned: "Judges concerned with the many elements comprised in our free, democratic society must take care lest they decide these cases on the basis simply of their indignation and disgust * * *." Because I for one take that warning seriously, I think this case should be remanded for a factual determination as to whether the arresting officer had probable cause to believe that

---

1. I am thus in full agreement with Judge Gallagher's observations: "A person can hardly be more under arrest than when an officer plainly tells him he is. In criminal law these are critical words and not mere conversation." Von Sleichter v. United States, D.C.C.A., 267 A.2d 336, 342 (1970) (dissenting statement).

2. It is worth noting that the Government did not even advance this argument before the trial judge or the District of Columbia Court of Appeals. The argument makes its first appearance in Judge Kern's opinion, in which neither Judge Gallagher nor Judge Nebeker concurred.

3. Nor do I know of any case which authorizes a judge to assess the offensive potential of words spoken on the street on the basis of what he would do "if they were shouted in a courtroom, or * * * court corridor." Majority op. at 1249. On the contrary, I had thought that the Constitution permitted sanctions on speech in and around courts which would not be permissible if applied to the streets. *See* Cohen v. California, 403 U.S. 15, 19, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971); Cox v. Louisiana, 379 U.S. 559, 562–564, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965).

appellant's words were so offensive where spoken as to threaten a breach of the peace.

After Williams v. District of Columbia, *supra*, it should be clear that a conviction under 22 D.C.Code § 1107 (1967) is permissible only in very special circumstances. It is not enough that "obscene" or "profane" language be spoken in a public place. In addition "the language [must] be spoken in circumstances which threaten a breach of the peace. And for these purposes a breach of the peace is threatened either because the language creates a substantial risk of provoking violence, or because it is, under 'contemporary community standards,' so grossly offensive to members of the public who actually overhear it as to amount to a nuisance." 136 U.S.App. D.C. at 64, 419 F.2d at 646. (Footnotes omitted.) Any broader reading of the statute would interfere with the "unwritten amenities [which] have been in part responsible for giving our people the feeling of independence and self-confidence, the feeling of creativity" and which "have encouraged lives of high spirits rather than hushed, suffocating silence." Papachristou v. City of Jacksonville, 405 U.S. 156, 164, 92 S.Ct. 839, 844, 31 L.Ed.2d 110 (1972).

I do not understand the majority to argue that Von Sleichter's arrest was permissible under the first branch of the *Williams* test—that is, because probable cause existed to believe that Von Sleichter's words created a risk of imminent violence. Nor would such an argument be tenable. Von Sleichter directed his epithet at the arresting officer, and it is clear that the risk of provoking a policeman to violence cannot justify an arrest since the police, as representatives of the law, are held to a higher standard than ordinary citizens.

*See* Landry v. Daley, N.D.Ill., 288 F. Supp. 183, 187, 192–193 (1968). *Cf.* Williams v. District of Columbia, *supra*, 136 U.S.App.D.C. at 64 n. 23, 419 F.2d at 646 n. 23. True, there is some evidence in the record that some other passers-by heard Von Sleichter's epithet, although even this fact is not unambiguously established.[4] But there is no evidence at all that these bystanders were about to resort to violence in order to retaliate for a verbal assault not even directed at them. Hence the situation is essentially the same as that described in Cohen v. California, *supra*:

> " * * * While the four-letter word * * * is not uncommonly employed in a personally provocative fashion, in this instance it was clearly not 'directed to the person of the hearer.' * * Nor do we have here an instance of the exercise of the State's police power to prevent a speaker from intentionally provoking a given group to hostile reaction. * * * There is * * no showing that anyone * * * was in fact violently aroused or that appellant intended such a result."

403 U.S. 15 at 20, 91 S.Ct. 1780 at 1786. If appellant's arrest is to be justified at all, then it must be supported on the basis of the second branch of the *Williams* test—that is, because his words are, "under 'contemporary community standards,' so grossly offensive to members of the public who actually overhear [them] as to amount to a nuisance." Williams v. District of Columbia, *supra*, 136 U.S.App.D.C. at 64, 419 F.2d at 646. It seems to me, however, that grave constitutional questions can be raised as to the continuing validity of the second branch of *Williams* after the Supreme Court's decisions in *Cohen* and *Gooding*. In *Cohen* the Supreme Court held that "the mere presumed presence of unwit-

---

4. The arresting officer testified as follows during the probable cause hearing:
   "A. * * * I asked if I could speak with him and he shouted the profanities and began to run.
   "Q. You didn't ask any of these people if they heard this; did you?

   "A. No, I didn't.
   "Q. You don't know if they did or not; is that correct?
   "A. That's correct."
   Transcript at 13.

ting listeners or viewers does not serve automatically to justify curtailing all speech capable of giving offense." 403 U.S. at 21, 91 S.Ct. at 1786. True, *Cohen* involved an expletive which was written rather than shouted and which was, in some sense, political. But the same cannot be said for the speech in *Gooding*, which was shouted at a policeman in a manner strikingly similar to that employed in this case. *See* 405 U.S. at 519–520 n. 1, 92 S.Ct. at 1103. The Supreme Court nonetheless found the statute under which the defendant was prosecuted facially invalid because its scope was not limited to "fighting words" likely to provoke immediate violence. *Cf.* Chaplinsky v. New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). In so doing the Court explicitly rejected the state's argument that it had an interest in preventing speech which was merely "offensive" even if it was unlikely to lead to immediate violence. A statute which "makes it a 'breach of peace' merely to speak words offensive to some who hear them * * * sweeps too broadly." 405 U.S. at 527, 92 S.Ct. at 1108. I fail to understand how this holding can be reconciled with the second branch of *Williams,* which makes punishable words "offensive to members of the public who actually overhear [them]."

Moreover, even if the second branch of the *Williams* test is still good law, there remains an insurmountable barrier to its use here. *Williams* requires a measurement of the language used against "contemporary community standards." But in order to perform such a measurement, the content of those standards must first be determined. Unfortunately, the record is altogether barren on this subject. There is no indication whatever that anyone who "actually overhear[d]" Von Sleichter's verbal assault was thereby offended, or that his words in any way departed from the standards of the community in which the incident occurred. The majority seeks to fill the lacuna by taking judicial notice of the fact that Von Sleichter's words "have at least some minimal shock quality." Majority opinion at 1249. With all respect, it seems to me this formulation represents a considerable watering down of the *Williams* test. It is one thing to find that this expletive has "at least some minimal shock quality," and quite another to find that it is, "under 'contemporary community standards,' so grossly offensive * * * as to amount to a nuisance."

When the correct test is applied, I think one can seriously question on a factual level whether these words still fit within it. Thus, although upper New England is hardly known for its lax community standards, Chief Judge Aldrich, writing for the First Circuit Court of Appeals about the same language used in this case, has stated, "[W]e cannot think that it is unknown to many students in the last year of high school," and noted that the words are used "by young radicals and protesters from coast to coast." Judge Aldrich went on to observe, "If * * * students must be protected from such exposure, we would fear for their future." Keefe v. Geanakos, 1 Cir., 418 F.2d 359, 361 (1969).

But it is not my intention to engage in arid debate about whether certain language is or is not consonant with modern community standards since there is, I think, a more important point to be made. In my view, this court commits a serious impropriety when it draws a conclusion about community standards without the benefit of any evidence in the record and without permitting argument on the point before the trial judge.[5]

I have never been one who believed that judges should check in their common

---

5. The majority contends that appellant implicitly concedes that he violated community standards by arguing that cursing is a useful safety valve. Majority op. at 1249. No doubt this "concession" will come as a considerable surprise to appel- lant. Since judicial notice seems to be in vogue, I think we can notice the fact that people do all sorts of things to relieve pent up hostility which by no stretch of the imagination violate community standards.

sense when they assume the bench or that studied myopia is a good substitute for judgment and wisdom. But neither do I think the case for judicial activism need rest on the obviously false premise that judges are omnipotent and omniscient. I share Professor Jaffe's view that "constitutional courts of this country are the acknowledged architects and guarantors of the integrity of the legal system." L. Jaffe, Judicial Control of Administrative Action 589 (1965). But that is not to say that judges can be everywhere and see everything. In fact, most judges by necessity lead somewhat insulated lives, and this very detachment which gives them the perspective to decide broad issues of policy makes them poor judges of community standards on the street.

Moreover, even if one assumes—erroneously, in my view—that judges are qualified to determine community standards in general, it still does not follow that they have the specialized knowledge which *Williams* requires. Under *Williams*, Von Sleichter can be punished only if his language was "so grossly offensive to members of the public *who actually overhear* it as to amount to a nuisance." 136 U.S.App.D.C. at 64, 419 F.2d at 646. (Emphasis added.) Hence the relevant community under the *Williams* test is not the nation as a whole or even the city of Washington. It is, rather, the immediate neighborhood in which the words were spoken. Surely we cannot assume that judges can speak authoritatively as to the community standards of a portion of the city about which they may know nothing and which they may never have even entered. When faced with the impossible task of articulating such standards on their own, it is almost inevitable that judges will slip over into the sort of individualistic, subjective judgments which the *Williams* test was designed to avoid.

It is fears such as these which have led some of our most respected judges to eschew the task of giving content on their own to community standards—a task which the majority casually assumes

today. Thus Judge Thornberry, writing for a panel of the Fifth Circuit, recently held that judges "cannot take judicial notice, without even a scintilla of evidence, of what constitutes the community standard of decency at this or any other time. If such a standard exists at all, we would expect that it would be in a constant evolutionary and even revolutionary flux, the fact of which militates against our exercising uninformed judgment at any particular point in time. At best it would be a matter of pure chance as to whether we as a Court, or as individuals left to our own devices and without the aid of evidence, could determine the correct standard." United States v. Groner, 5 Cir., 475 F.2d 550, 557 (decided January 11, 1972). Similarly, in a scholarly and careful opinion by Mr. Justice Tobriner, the California Supreme Court has held that an obscenity conviction cannot stand unless expert evidence is introduced at trial as to contemporary community standards.

"Relying principally on the well established doctrine that jurors should not be endowed with the prerogative of imposing their own personal standards as to the test of criminality of conduct, we hold that expert testimony should be introduced to establish community standards. We cannot assume that jurors in themselves necessarily express or reflect community standards; we must achieve so far as possible the application of an objective, rather than a subjective, determination of community standards. An even-handed application of the criminal law, even with evidentiary guidance * *, is sufficiently difficult in an area so confusing and intricate as obscenity. To sanction convictions without expert evidence of community standards encourages the jury to condemn as obscene such conduct or material as is personally distasteful or offensive to the particular juror. * * * "

In re Giannini, 69 Cal.2d 563, 72 Cal. Rptr. 655, 663, 446 P.2d 535, 543 (1968). (Footnote omitted.) And of course I have already quoted Judge Leventhal's

eloquent warning against individualistic, judicially imposed community standards. *See* text at pages 1250–1251 *supra.* The majority does not begin to explain why this court's past refusal to "rest on our own untutored view" of the character of the activity involved, Huffman v. United States, *supra,* 152 U.S.App.D.C. at 254, 470 F.2d at 402, should not extend to this case. *See also* United States v. Klaw, 2 Cir., 350 F.2d 155, 170 (1965); Comment, Expert Testimony in Obscenity Cases, 18 Hastings L.J. 161 (1966).

To be sure, there are some jurisdictions where juries, at least in some cases, are allowed to evaluate putatively obscene material without expert guidance and measure it against their own notions of what the community standard is. *See, e. g.,* United States v. Wild, 2 Cir., 422 F.2d 34 (1969), cert. denied, 402 U.S. 986, 91 S.Ct. 1644, 29 L.Ed.2d 152 (1971); Kahm v. United States, 5 Cir., 300 F.2d 78, cert. denied, 369 U.S. 859, 82 S.Ct. 949, 8 L.Ed.2d 18 (1962). But these cases are premised on the notion that juries themselves function as the embodiment of the community and therefore require no experts to tell them what the community thinks. Appellate judges are not, of course, the embodiment of the community. Indeed, their decisions derive legitimacy from the fact that the judiciary is insulated from transient community passions and prejudices. "Since an appellate court certainly does not in any sense compose a cross-section of the community, it cannot effectively carry out [its review] function in the absence of evidence in the record directed toward proof of the community standard." In re Giannini, *supra,* 72 Cal.Rptr. at 664, 446 P.2d at 544. (Footnote omitted.)

Moreover, even in those jurisdictions permitting convictions without expert

evidence as to community standards, the defendant is at least *allowed* to introduce such evidence as part of his rebuttal case. As Mr. Justice Frankfurter made clear years ago:

" * * * Since the law through its functionaries is 'applying contemporary community standards' in determining what constitutes obscenity, * * * it surely must be deemed rational, and therefore relevant to the issue of obscenity, to allow light to be shed on what those 'contemporary community standards' are. Their interpretation ought not to depend solely on the necessarily limited, hit-or-miss, subjective view of what they are believed to be by the individual juror or judge. * * * "

Smith v. California, 361 U.S. 147, 165, 80 S.Ct. 215, 225, 4 L.Ed.2d 205 (1959) (concurring opinion).

Yet in this case Von Sleichter was effectively deprived of the opportunity to prove that his conduct was in conformance with community standards—a deprivation which, according to Mr. Justice Frankfurter, "goes to the very essence of the defense and therefore to the constitutional safeguards of due process." *Id.* at 165, 80 S.Ct. at 225. True, Von Sleichter never made an actual offer of proof as to community standards before the trial judge, and none of his evidence was excluded. But a close reading of the hearing record makes plain that the prosecutor did not argue that there was probable cause to arrest Von Sleichter for disorderly conduct. Rather, his argument—and presumably the decision of the trial judge as well—was premised on the existence of probable cause to make a narcotics arrest.[6] Surely we expect too much if we require the defendant to anticipate and rebut an argument which the Government failed to make either at

6. Thus the prosecutor made the following statement in summation:
"We don't rely solely on the flight. We rely on three factors—the area; the transaction, the seemingly [*sic*] transaction the officer saw; and, the flight. Which, in the Government's po-

sition, brings the case over the ledge to attain probable cause. It may be a fine question. That's the Government's position. We'll leave it to the court to decide."
Tr. at 19.

the hearing or in its appellate brief and which made its first, unheralded appearance in an opinion by one of the reviewing judges of the District of Columbia Court of Appeals. Placing this burden on the defendant would require him to introduce evidence of a lack of probable cause for arrest for every crime listed in the statute books. Thus, even if I agreed with the majority that judges are qualified to discern the community standard on their own, I would still hold that this case should be remanded to allow appellant to introduce evidence on this vital question.

One final point needs to be made. The majority suggests that the principles governing this case are somehow different because the question before us is not whether Von Sleichter actually committed the crime of disorderly conduct, but rather whether the police officer had probable cause to believe that the crime had been committed. But while it is true that the Government's burden of proof is substantially lower in a probable cause hearing than it would be in a criminal prosecution, *see, e. g.*, Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949), this difference has never been thought sufficient to transmogrify a question of fact about which evidence is required into a question of law which the judge can decide without evidence. We have held that "[p]robable cause is a plastic concept whose existence depends on the facts and circumstances of the particular case," and that "[m]uch less evidence than is required to establish guilt is necessary." Bailey v. United States, 128 U.S.App. D.C. 354, 357–358, 389 F.2d 305, 308–309 (1967). But we have also made clear that the burden is on the Government to establish probable cause and that it cannot meet this burden by putting on testimony as to the bare facts surrounding the arrest and depending upon the trial judge to fill in the gaps. I agree with the majority that "[w]e must give some credit to the policeman for ability to assess the ordinary impact of the sights and sounds he hears." But there is no

indication in this record that the arresting officer made such an assessment. The officer did not testify that he was aware of community standards in the area, that in his judgment appellant had violated those standards, or that he thought a breach of the peace was imminent. Rather, the officer's testimony consisted entirely of a skeletal account of Von Sleichter's conduct prior to the arrest. Our comments in Wrightson v. United States, 95 U.S.App.D.C. 390, 392, 222 F.2d 556, 558 (1955), where the Government testimony was similarly elliptical, seem particularly apt:

> "The point here is that at the trial, when the search and the arrest were under attack as illegal, the officer and the prosecutor chose not to reveal what cause there was for the arrest and thus not to support its legality. There is law which governs arrest, that law is binding upon police officers, and persons arrested have a right to invoke it."

This court has recently gone to great lengths to show that arrests are not somehow insulated from the constitutional protections which surround the rest of the criminal process. *See* Hall v. United States, 148 U.S.App.D.C. 831, 459 F.2d 831 (*en banc*). I am surprised and disappointed to see this salutary principle apparently abandoned so soon after its exposition.

By citing *Hall*, however, I do not mean to suggest that the law upon which I rely is in any way new. In fact, it has been clear for at least 50 years that, when the Fourth Amendment is raised to challenge the admissibility of evidence, the trial judge must hold a hearing to evaluate the competing factual assertions of the parties with respect to how the evidence was obtained. *See* Gouled v. United States, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647 (1921); Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939). Of course, such a hearing would be a meaningless formality if the trial judge were permitted to assume, without the benefit of evidence, that probable cause existed for a chal-

lenged search or arrest. *See, e. g.,* United States v. Jeffers, 342 U.S. 48, 51, 72 S.Ct. 93, 96 L.Ed. 59 (1951); United States v. Johnson, 9 Cir., 425 F.2d 630, 632 (1970), cert. dismissed, 404 U.S. 802, 92 S.Ct. 21, 30 L.Ed.2d 35 (1971); Williams v. United States, 5 Cir., 382 F.2d 48, 50 (1967). Hence it is hardly surprising that the Supreme Court has stood ready to reverse a conviction when insufficient evidence appeared on the record to show that the search or seizure comported with the commands of the Fourth Amendment. *See, e. g.,* Recznik v. City of Lorain, 393 U.S. 166, 168, 89 S.Ct. 342, 21 L.Ed.2d 317 (1968). Moreover, these procedural requirements are particularly vital where, as here, First Amendment rights are at stake—rights which can be stifled as effectively by a wrongful arrest or seizure as by a wrongful conviction. *See* Monaghan, First Amendment "Due Process", 83 Harv.L.Rev. 518, 538 (1970). *Cf.* Marcus v. Search Warrants, 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961); A Quantity of Copies of Books v. Kansas, 378 U.S. 205, 84 S.Ct. 1723, 12 L.Ed. 2d 809 (1964).

I am at a loss to understand why these long-standing principles should be ignored in this case. To be sure, usually the Fourth Amendment problem arises in the context of a challenge to the identity of the defendant, whereas here the issue is whether a crime was committed at all. But surely this is not a difference in principle. Probable cause requires not only a reasonable determination by the arresting officer that the suspect is probably guilty, but also a reasonable determination by the officer that criminal conduct has occurred. In this case, criminal conduct can only have occurred if community standards were violated. And we cannot know whether these standards have been violated until we have some evidence as to what the standards are.

It is possible, I suppose, to imagine some hypothetical case where a fact is not sufficiently obvious for judicial notice in a criminal trial but can be noticed under the lower standard of proof applicable in a probable cause hearing. But the theoretical existence of such a possibility should not trouble us in this case. Where, as here, there is no evidence of imminent violence, no evidence that anyone was offended by the defendant's words, and only inconclusive evidence as to whether the words were overheard at all, I would require at least some testimony as to community standards before sanctioning a disorderly conduct arrest. As Mr. Justice Harlan has reminded us in an only slightly different context, "Any broader view * * * would effectively empower a majority to silence dissidents simply as a matter of personal predilections." Cohen v. California, *supra,* 403 U.S. 15 at 21, 91 S.Ct. 1780 at 1786. And lest we underestimate the stakes in criminal prosecutions such as this one, Mr. Justice Harlan offers another admonition:

"To many, the immediate consequence of [First Amendment] freedom may often appear to be only verbal tumult, discord, and even offensive utterance. These are, however, within established limits, in truth necessary side effects of the broader enduring values which the process of open debate permits us to achieve. That the air may at times seem filled with verbal cacophony is, in this sense[,] not a sign of weakness, but of strength. We cannot lose sight of the fact that, in what otherwise might seem a trifling and annoying instance of individual distasteful abuse of a privilege, these fundamental societal values are truly implicated. * * *"

*Id.* at 24–25, 91 S.Ct. at 1788.

In my view, the majority has failed to take sufficient cognizance of the "fundamental societal values" implicated in this case. I must, therefore, respectfully dissent.

Supplemental Opinion

LEVENTHAL, Circuit Judge:

Appellant's petition for rehearing and the memorandum of amicus lodged with

the court, focus on Gooding v. Wilson, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972) and Cohen v. California, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971). We have considered these opinions again, especially in view of the orders entered by the Supreme Court on June 26, 1972, in Rosenfeld v. New Jersey, Lewis v. City of New Orleans, and Brown v. Oklahoma, 408 U.S. 901, 92 S.Ct. 2479, 33 L.Ed.2d 321 (1972), vacating convictions for disorderly conduct and remanding for consideration in the light of *Gooding* and *Cohen.*

None of these cases involve constitutional immunity for the particular conduct, but the very distinct question of the overbreadth of the underlying statute. Convictions under such statutes must be reversed even though a narrower statute could concededly be applied to prohibit the conduct involved. The issue of statutory overbreadth is not a problem in the District of Columbia, because our disorderly conduct laws, 22 D.C.Code §§ 1107, 1121, have been subjected to a narrowing construction by this court in Williams v. District of Columbia, 136 U.S.App.D.C. 56, 419 F.2d 638 (en banc, 1969).

■ Apart from the "fighting words" context, *Williams* sets forth that the statute is not applicable for mere use "of indecent or obscene words" but only if the language "is, under 'contemporary community standards,' so grossly offensive to members of the public who actually overhear it as to amount to a nuisance." We think this is valid under *Gooding* and *Cohen.**

■ Appellant believes that we misread Williams, and that it disallows any statutory prohibition on "talking back" to a policeman. Our opinion does not sanction an arrest for disorderly conduct

for talking back to a policeman, but rather upholds the policeman in finding probable cause to believe appellant subjected bystanders to a nuisance. There is not a glimmer or scintilla in this record of any indication of bad faith, harassment or police misconduct. Whether the policeman had probable cause to believe that a misdemeanor had been committed in his presence is erroneously confused by appellant with the quite distinct question of whether there was proof of such a violation beyond a reasonable doubt.

We were not required in this case to consider whether or under what circumstances a valid arrest of a person not in flight may turn on the policeman's ascertaining the impact of the words on the hearers or overhearers as part of his assessment of defendant's conduct. In this case appellant was in flight, was validly detained from further flight, and was thus properly searched for weapons. The conduct of the arresting officer was reasonable under the circumstances, and the subsequent discovery of the heroin was not unlawful.

Petition for rehearing denied.

J. SKELLY WRIGHT, Circuit Judge, dissenting:

For obvious reasons, the majority feels the need to distinguish the *Rosenfeld, Lewis* and *Brown* cases decided by the Supreme Court after our panel opinions came down. I submit the distinctions sought to be made are without substance.

The majority asserts that "[t]he issue of statutory overbreadth is not a problem in the District of Columbia" because 22 D.C.Code §§ 1107 and 1121 "have been subjected to a narrowing construction by this court in Williams v. District of Columbia * * *." Yet in Rosenfeld

---

* In Rosenfeld v. New Jersey, the Supreme Court remanded for reconsideration under a statute, prohibiting public uttering of profane or indecent language, that was construed to apply whenever words were "likely, in the light of the gender and age of the listener and the setting of the utterance, to affect the sensibilities of the

hearer." State v. Profaci, 56 N.J. 346, 353, 266 A.2d 579, 584 (1970). Without attempting to predict the outcome of Rosenfeld, we see a distinction between language that merely affects the sensibilities of others, and language so grossly offensive under contemporary community standards as to amount to a nuisance.

**1258**

v. New Jersey the Supreme Court summarily vacated a New Jersey disorderly conduct conviction over Mr. Justice Powell's dissenting opinion wherein he correctly pointed out that the New Jersey Supreme Court's construction of its statute was almost identical to the construction of our statute adopted in *Williams*.

The majority also says our task is made easier by the fact that we can uphold the arrest in this case without reaching the question whether the underlying statute could constitutionally support a conviction. Perhaps I am overly simplistic about these matters, but I had thought that the First Amendment protected citizens from harassing arrests as well as convictions. Indeed, the Supreme Court has even held that when arrests are made by state officers for conduct which cannot possibly serve as a constitutional predicate for conviction, the federal courts have a special obligation to intervene. *See* Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L. Ed.2d 669 (1971); Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1961). In my view, we should fulfill that obligation on this appeal.